**UNITED STATES of America, Appellee,**

v.

**John TAYLOR, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Kelly TWOMEY, Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Wayne LAFRANCE, Defendant, Appellant.**

**Nos. 81–1570, 81–1580 and 81–1585.**

United States Court of Appeals, First Circuit.

Argued May 4, 1982.

Decided July 19, 1982.

Certiorari Denied Oct. 18, 1982.

See 103 S.Ct. 261.

---

Marvin D. Miller, Alexandria, Va., with whom Jay Colangelo, Alexandria, Va., Richard S. Emerson, Jr., Portland, Me., and Ronald J. Chisholm, Boston, Mass., were on brief, for defendants, appellants.

Margaret D. McGaughey, Asst. U. S. Atty., Portland, Me., with whom Richard S. Cohen, U. S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, and ALDRICH and BREYER, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

We add herewith to our collection of Tall Tales concocted by drug smugglers on the coast of Maine. *Compare United States v. Weber*, 1 Cir., 1981, 668 F.2d 552, *cert. denied,* —— U.S. ——, 102 S.Ct. 2904, 73 L.Ed.2d 1313, boat allegedly detained by "storm" on calm moonlight night) with instant yacht choosing to stay in poorly protected spot with concededly inadequate anchor, although warned of coming high winds and sea. More will appear in due course.

On July 24, 1979, defendant Taylor, having executed a three-weeks bareboat charter, took possession of the 51 foot ketch I FORGOT at Curacao, Dutch Antilles, paying a charter fee of $6,600, plus a $5,000 deposit. On September 6, three weeks after the charter's expiration, the yacht was seen anchored in upper Frenchmens Bay, Maine, where she ignored the fisherman's warning. The next morning she was discovered on the rocks near a deserted beach, slightly holed, and having taken water thereby. No one was on board, and all personal effects, including linen, had been removed. The boat was littered, from bow to stern, on deck and below, with marijuana debris. In addition, some 4 pounds of marijuana were subsequently found in the woods behind the beach. Warrantably marijuana had recently been off-loaded.[1] An onshore wind of 30 knots, or more, had blown during the night. At high water lobstermen hauled her off. Her sails were badly torn, her batteries under water, and nothing functioned. They towed her to Sorrento Harbor, where the harbormaster put her on a mooring and placed a pump on board.

An hour or so afterwards the yacht was searched by one, later by a second, state police officer. Paralleling the custom of defendants making up stories in such cases,

---

1. At the suppression hearing Taylor conceded that something, not identified, had been off-loaded the night of September 6.

the search and seizure was conducted without a warrant, and far exceeded a permissible search for evidence of ownership. At the suppression hearing one of the officers testified that the harbormaster had said the boat was in danger of sinking, but the harbormaster denied this, and with him in charge, and a pump aboard, the denial seems logically correct. If there were a danger of sinking, obviously he would beach her. A magistrate was not far away.

■ That officers are not told to obtain warrants, or, if they are told, should place themselves above instructions in such cases, is inexcusable. This omission cost a one day court hearing, with witnesses and expense. In addition, the court had to prepare findings and three judges now have to review them. Beside such wasted time and effort, a warrantless search always risks the loss of the evidence altogether. All this because of a little laziness on the part of officers whose duty is to obey a very simple requirement.

At the suppression hearing, resolved in the government's favor, it appeared that defendant Taylor, and co-defendants Twomey and LaFrance, had sat in the woods watching the rescue without attempting to make themselves known, and that Taylor had hitchhiked towards the harbor, but had taken off on seeing the lights of a police car. The other defendants had taken off without approaching the harbor. None was apprehended until some months later. Convicted of conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846, they appeal. We affirm.

■ Defendants' first complaint is the warrantless search and seizure. We do not accept the government's claim that defendants had lost their privacy interest in the vessel due to the charter's expiring. (Nor, of course, could the officers know the status of the charter.) Unlike the vacated hotel-room cases cited by the government, *e.g.,*

*United States v. Buchanan,* 5 Cir., 1980, 633 F.2d 423, 426, *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301; *United States v. Cowan,* 2 Cir., 1968, 396 F.2d 83, termination of the charter did not restore the owner's physical possession. Rather, defendants manifestly remained in charge with, doubtless, contractual or quasi contractual rights and obligations. We do, however, accept the court's finding that when defendants left the vessel ashore, they abandoned her. No line had been made fast, and no writing left advising the name or whereabouts of the owner or master, or stating an intent to return. This was an obvious salvage situation, and any mariner would know he should leave some kind of notification. This lack, coupled with the removal of all personal effects and the speaking evidence of marijuana debris as a reason for abandonment, more than warranted the court's finding.[2] Abandonment meant loss of any expectation of privacy. *Abel v. United States,* 1960, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668; *United States v. Miller,* 1 Cir., 1978, 589 F.2d 1117, 1131, *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771. The motion to suppress the various items seized from the yacht was properly denied.

■ There was also no merit in defendants' criticism of the charge. The court charged as follows.

"[Y]ou must then determine the purpose of the conspiracy. . . . You may find the defendant in question guilty of the conspiracy to possess with the intent to distribute. If you find that the object was not distribution you shall enter a not guilty verdict as to that charge. If you find the defendant not guilty of conspiracy with the intent to distribute, then you must determine if a conspiracy existed for the purpose of simple possession rather than distribution."

Defendants objected because the court failed to grant their request that if the jury

---

**2.** The reasonableness of this last inference was confirmed by Taylor's testimony that fear of arrest was why they did not make themselves known. While no one was aware of this at the time, neither can defendants better their case by saying their fear made their abandonment involuntary. *United States v. Kendall,* 9 Cir., 1981, 655 F.2d 199, *cert. denied,* ―― U.S. ――, 102 S.Ct. 1434, 71 L.Ed.2d 652; *United States v. Colbert,* 5 Cir., 1973, 474 F.2d 174, 176 (en banc).

found they possessed marijuana with "intent to distribute to other members of the conspiracy you must find them not guilty." We are not clear what this confusing statement means. If it had any substance beyond the charge given, it could only have been that there was no intent to distribute if the unknown persons ashore were to be considered personal use co-conspirators. In defendants' case of *United States v. Swiderski*, 2 Cir., 1977, 548 F.2d 445, there was evidence that the two alleged conspirators, husband and wife, had simultaneously and jointly acquired possession of a drug for their own personal use, without intending to distribute the drug further. The court held that an instruction which allowed a conviction of distribution under such facts was error. Without passing on the soundness of that case, it has no application here, since the complex nature of the operation and the amount of marijuana confiscated belies defendants' contention that they did not intend to transfer the drugs to other persons. *United States v. Wright*, 9 Cir., 1979, 593 F.2d 105, 108. There is no obligation to charge with respect to circumstances not conceivably made out. *E.g., United States v. Prieskorn*, 8 Cir., 1981, 658 F.2d 631, 636; *United States v. Irwin*, 1 Cir., 1979, 593 F.2d 138, 140–41. The charge given defined defendants' intent to distribute as distribution "to others" and referred to the lesser included offense of simple possession, and was fully adequate under the facts of this case.

Finally, we deal with the court's failure to suppress certain photographs, positives ordered by the police from four rolls of negatives left by one of the defendants with a Massachusetts processor for development. By happenstance an officer was conversing socially with the owner of the establishment while an employee, engaged in running off samples for test purposes, noticed some unusual depictions and exclaimed, calling the officer's attention thereto. The prints showed tropical scenes, bales, apparently of marijuana, on a yacht, and one instance of a man sitting on a bale with a shotgun or rifle. The officer ordered an extra set to be made for him. No warrant was sought. Defendants, prior to trial, moved, unsuccessfully, to suppress, and for the return of the prints, and now appeal from their introduction into evidence.

Defendants' argument is a pot pourri. Although at one point they argue they, or at least LaFrance, the delivering defendant, had an expectation of privacy in the films, they concede that "none of their Fourth Amendment rights were implicated by the police observation of the print sheet inadvertently (sic) exposed to the officer by the employee." This concession is not only correct, it covers the whole case. The court warrantably found this to be a situation where exposure, in the broad sense, by an employee could reasonably be expected. *Cf. Smith v. Maryland*, 1979, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220. Once lost by this plain view exposure, the concept of privacy cannot be revived to prevent copying. The police undertook no impermissible seizure by making a copy, leaving the negative, and defendants' copies, undisturbed. *See Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564.

*Affirmed.*