# United States Court of Appeals
## For the First Circuit

No. 05-2000

UNITED STATES OF AMERICA,

Appellee,

v.

LIONEL CORMIER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lynch, Circuit Judge.

Dennis A. Murphy, for appellant.
F. Mark Terison, Senior Litigation Counsel, with whom Paula D.
Silsby, United States Attorney, was on brief, for appellee.

November 17, 2006

**TORRUELLA**, <u>Circuit Judge</u>. Lionel Cormier ("Cormier") was convicted of possession with intent to distribute a controlled substance in violation of 18 U.S.C. § 841(a), conspiracy to distribute a controlled substance in violation of 18 U.S.C. § 846, possession of a firearm during a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(a)(ii), and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(e). Cormier appeals his conviction. After careful consideration, we affirm.

## I. Background

In early 2003, Cormier met with his friend David Finch ("Finch") and began to discuss plans to rob drug dealers and purchase guns. Cormier also met with Stephen Depka ("Depka"), with whom he discussed a proposal to transport marijuana from Maine to Massachusetts. Depka refused the proposal. Cormier nevertheless began investigating potential robbery targets.

### The Darragh Robbery

Finch's then-girlfriend, Tracy Paquette ("Paquette"), suggested to Cormier that he rob Michael Darragh ("Darragh"), whom she believed to be a drug dealer and whose house was located in Maine. Paquette called a friend, Winston Hanson ("Hanson"), to verify that Darragh had drugs in his house. Hanson confirmed that Darragh did, in fact, possess drugs. Cormier later decided to include Hanson in the robbery plans.

-2-

Around midnight on March 23, 2003, Cormier, Finch, and Hanson robbed Darragh's house. Finch and Cormier put on ski masks and gloves and broke into Darragh's house; Hanson stayed in the car as a lookout. Cormier and Finch found Darragh inside his house. When confronted with a gun, Darragh told Cormier and Finch that his drugs were in his jacket pocket. Finch removed 20 to 30 Oxycontin pills, "some" Percocet pills, walkie-talkies and knives from the jacket. Finch also took $800-$900 in cash. After the robbery, Cormier, Finch, and Hanson returned to Hanson's home. There was general agreement among witnesses at trial that Cormier took all of the money. In addition, Finch testified at trial that Cormier traded pills to Hanson for marijuana, whereas Hanson testified that Cormier paid for the marijuana in cash. After the Darragh robbery, Cormier had an acquaintance purchase a Ruger .454 Magnum gun for him.

## The Kane Robbery

The second robbery took place on June 11, 2003, also in Maine, at the house of Steve Kane, a drug dealer known to Cormier. Cormier and Finch obtained the help of Michael Gleason ("Gleason") for the robbery; Hanson was no longer involved. Paquette drove Gleason and Cormier to Kane's house, armed with the Ruger .454 Magnum, ski masks, gloves, and zip ties, as well as walkie-talkies, which were to be used to contact Finch at the conclusion of the robbery. Cormier and Gleason entered Kane's house, but found

nobody at home. Gleason searched the house and discovered a rifle and a handgun, which he took. Cormier and Gleason then waited for Kane to come home. Kane arrived at his house carrying a duffel bag. Cormier and Gleason confronted Kane, and told him that they wanted his money and marijuana. Gleason took five pounds of marijuana from Kane's duffel bag and $500 from Kane's truck. Cormier and Gleason then fled. Finch picked up Cormier and Gleason in a cemetery near Kane's home. Upon returning to Finch's home, the proceeds of the robbery were divided. Cormier allocated to Finch and Paquette[1] one pound of the stolen marijuana to share and divided the remainder between himself and Gleason. Cormier, Finch, and Gleason then proceeded to smoke some of the marijuana.

## The Dyer Robbery

The third robbery took place a few hours after the Kane robbery. Cormier had heard that Tom Dyer ("Dyer") had previously been arrested for possession of large amounts of marijuana and believed that Dyer would likely have drugs at his house. Finch drove Cormier and Gleason in Paquette's car to Dyer's home. Upon arriving, Cormier, Finch, and Gleason congregated in front of Dyer's house discussing their plans. Dyer awoke and went to investigate. Cormier broke the front window with his gun, reached in to unlock the door, and entered the house. Dyer yelled that he

---

[1] There is some conflict in the testimony as to whether Paquette received a share of the marijuana directly from Cormier.

-4-

was going to call the police. The police arrived, and Cormier, Gleason and Finch scattered.

Gleason was apprehended shortly after police arrived. Finch spent the night in the woods by Dyer's house, but was apprehended the next morning. Paquette's car was discovered near Dyer's home; after Paquette consented to a search of it, wallets belonging to Gleason and Finch, as well as gloves and walkie-talkies were found therein. Cormier escaped by stealing a canoe, paddling across a lake, and walking to a donut shop, where he called his girlfriend to pick him up. Cormier called Paquette the morning following the attempted robbery of Dyer and instructed her to give Finch, Gleason, and himself their respective shares of marijuana as per their discussion the previous night, and that Gleason's share should go to Jeff Simpson ("Simpson") to pay for Gleason's bail. Cormier also instructed Paquette that a man would come to collect his share of the marijuana and guns, which were left in a bag. Five days after the robbery, Vincent Andrews ("Andrews"), an acquaintance of Cormier, arrived at Paquette's house to collect Cormier's bag. Andrews testified at trial that Cormier had paid him $50 to retrieve the bag, but that he never looked inside it. A year after the attempted Dyer robbery, Cormier was arrested and charged with possession of a controlled substance with intent to distribute, conspiracy to distribute a controlled

substance, possession of a firearm during a drug trafficking offense, and being a felon in possession of a firearm.

## Motion to Exclude the ATF Agent's Testimony

Prior to trial, the Government notified Cormier that it would offer Brent McSweyn ("McSweyn"), an Alcohol Tobacco and Firearms agent, to testify as an expert regarding whether the guns used in the crimes had passed through interstate commerce.[2] Cormier made a motion in limine to exclude McSweyn's testimony. In response, the Government explained that McSweyn had testified before as an "interstate nexus expert," and had toured gun manufacturing facilities, spoken with manufacturers, and consulted reference materials. McSweyn submitted a written "Interstate Nexus Statement" in response to Cormier's motion, in which McSweyn stated that the firearms charged in the indictment were manufactured outside of Maine (and thus had traveled in interstate commerce). The statement indicated that McSweyn had inspected the Ruger .454 Magnum and compared it with manufacturing records, two reference texts, and his observations in manufacturing plants. The statement further indicated that McSweyn had compared a written description of the rifle, including model, caliber, and serial number, with manufacturing reports and reference texts. Lastly, the statement

_____

[2]  21 U.S.C. § 922(g) criminalizes possession, by a felon, of a firearm "which has been shipped or transported in interstate commerce."  Thus, whether the gun has crossed state lines is an element of the offense.

indicated that McSweyn had compared a written description of the handgun with manufacturing reports, reference texts, observations in manufacturing plants, and a firearms trace report. The court tentatively overruled Cormier's objections to McSweyn's testimony, but allowed Cormier to voir dire him. During voir dire, McSweyn testified that the gun manufacturer records he relied upon were not available to the public. After Cormier concluded the voir dire, the court reaffirmed its denial of Cormier's motion, noting that "the public could 99 percent of the time receive information as to manufacturer and location from the public record, [but] that of course, does not take away from the ability to offer expert testimony on a particular issue."

### The Opening Statement

The trial began in March 2005. During her opening statement, the prosecutor said:

> You will hear from Michael Gleason and Mike Darragh and Jody Darragh, and from the start they admitted they were drug dealers and told the truth and you will also hear from Tracy Paquette and from David Finch and it will be up to you to determine whether they are telling the truth.

Cormier objected; the court sustained the objection, noting, "That is for closing." The prosecutor continued, stating:

> And you will hear from Travis Sawyer who bought the 454, and victims of the Bucksport robbery. He had to admit that he was dealing marijuana before he could come in and testify in court . . . . And you will hear from Meg Donelan, Mr. Cormier's girlfriend, who drove

-7-

him home and covered for him when the police came for interview. These people are not people who want to help the police, they are not people who volunteer information and not people who by any means who would choose to be on the stand testifying.

Cormier objected again, and the court sustained the objection, cautioning, "It's not argument. This is opening in terms of what you expect to show for evidence." The prosecutor continued, stating:

> The other point I wanted to make, and understanding that the key witnesses might have credibility problems, is that the government has taken every step it could to corroborate as many of the details these witnesses will testify to as possible. . . . [describing some of the corroboration] . . . While the first line of witnesses may be impeachable, this second line of witnesses and evidence is not.

Cormier again objected, and the court sustained the objection, warning the prosecutor not to "indicate argument as to what is impeachable or not. Present the evidence you're going to present." Cormier then moved for a mistrial. The court denied the motion, stating:

> I think there were instances where the prosecutor came close to vouching for witnesses or indicating the witnesses were telling the truth. I don't know that you stepped over that line. I was uncomfortable as to the degree of closeness. I will give the jury a cautionary instruction. I think in terms of this case, I don't think it has poisoned the well. This is a long trial, I'm not sure that the jury will remember anything about openings by the time they get this case. I will give them cautionary instructions and

we'll move on. I don't think they have been poisoned by what they've heard.

The court then cautioned the jury:

I told you earlier statements by counsel are not evidence and therefore you have not heard any evidence in this case. What they told you is not evidence. Number two. To the degree counsel has indicated to you that they believe a particular witness is telling the truth or not telling the truth, disregard that entirely, it is not for counsel to indicate, it's up to you to determine. In addition, counsel is not permitted to indicate to you that they believe someone is telling the truth or they are likely telling the truth. There again, it is for you to understand and determine and not for anyone else to tell you or to determine. So you are to ignore entirely such statements.

## The Trial

The trial proceeded, and the Government's witnesses, including Finch, Paquette, and Gleason testified to the foregoing facts. In particular, ATF Agent McSweyn testified in accordance with the "Interstate Nexus Report" he had offered in response to Cormier's motion. Agent McSweyn testified that the Ruger .454 Magnum was manufactured in New Hampshire and shipped to a distributor in Massachusetts, and then was shipped to a retailer in Maine where it was purchased. Agent McSweyn further testified that the handgun was manufactured in Arizona or New Hampshire and that the rifle was manufactured in Connecticut. Cormier objected every time Agent McSweyn testified about the origin of a firearm.

Cormier chose not to testify in his own defense. On cross-examination, Finch admitted that he had lied about the robberies in his testimony before a grand jury. Finch, Paquette, and Gleason all admitted that they cooperated with the police in exchange for more lenient sentences. In addition, Finch and Gleason admitted to having prior criminal records.

### The Closing Argument

During her closing argument, the prosecutor stated:

So when you make your credibility determinations, ladies and gentlemen, bear in mind that it's not just what the witnesses said that you can consider to determine whether they are telling the truth. All of that evidence that I've just gone over in some detail bolsters what they said here on the stand.

. . .

The ultimate decision on credibility is yours but the government suggests that it took a lot of honor and courage for those witnesses to testify, to stare [Cormier] in the face and tell their stories and that they are worthy of their belief.

. . .

I said during my opening that one of the things you will need to consider in this case is Mr. Cormier's own words and actions, because what else better is there to tell what a person is thinking than by watching what they are saying what they are doing. I would like you to review one last point on the issue of Mr. Cormier's own credibility. . . . Ladies and gentlemen, it is said you can tell a lot about a person by the company he keeps. This week you have seen on the witness stand the company that Lionel Cormier keeps. They were robbers. They were drug dealers. They were felons. They were drug addicts. The government sure did not choose the witnesses in this case, in fact in a very real sense Mr. Cormier

-10-

did. Because until Mr. Cormier was charged with this crime, these people were his trusted associates, his long time friends, even the woman with whom he shared his home.
. . .
[The witnesses] may not be model citizens, and they may not be people you want your children to marry, but their testimony is worthy of your belief, especially when considered in the light of all the other evidence you will have before you in your deliberations.

Cormier moved for a mistrial, arguing, "Mr. Cormier's credibility is not an issue in this trial." The court denied the motion, replying:

[G]overnment counsel has come perilously close on closing to comment[ing] on the defendant's non[]-testimony, including the statements with regard to the [what] only evidence in the case is . . . . [and the] comments on his credibility. . . . The government [also] came perilously close by vouching for certain witness' testimony. . . . I don't think that the closing stepped over the line and I'm not going to declare a mistrial.

The court then offered to give additional instructions to the jury if the defense so requested, but Cormier declined to do so.

## The Jury Instructions

At the conclusion of the trial, Cormier requested a jury instruction based on his reading of the holding of the Second Circuit in United States v. Swiderski, 548 F.2d 445 (2d Cir. 1977). Cormier's proposed jury instruction stated, in part: "[I]f you find that individuals jointly and simultaneously possessed the drugs with the intent to share them amongst themselves as users, you may

-11-

not find the Defendant guilty of distribution, aiding and abetting distribution, or possession with intent to distribute."

The court instructed the jury: "[W]hen individuals come into joint <u>actual</u> possession of a quantity of drugs that they intend to keep for their own personal use, there is no 'intent to distribute' under the law" (emphasis added). Cormier objected to the jury instruction on the grounds that it included the word "actual" when describing joint possession. The court overruled Cormier's objection.

The court further instructed the jury:

> The defendant has a constitutional right not to testify and no inference of guilt or anything else may be drawn from the fact that the defendant did not testify. . . . [F]or any of you to draw such an inference against this defendant would be wrong, indeed, it would be a violation of your oath as a juror. . . . [Y]ou do not have to accept the testimony of any witness if you believe that the witness was not credible. . . . Arguments and statements by lawyers are not evidence.

The jury convicted Cormier on all counts. Cormier was sentenced to a total of 411 months imprisonment to be followed by five years of supervised release. Cormier now appeals his conviction.

## II. Discussion

### A. Sufficiency of the Evidence

Cormier begins by arguing that the jury had insufficient evidence to find that he intended to distribute the drugs he

obtained during the robberies. We review Cormier's challenges to the sufficiency of the evidence de novo, examining the evidence in the light most favorable to the Government. United States v. Hall, 434 F.3d 42, 49 (1st Cir. 2006).

Taking the evidence in the light most favorable to the government, it appears that Cormier gave some of the stolen drugs to Finch, who was not physically present when the Dyer robbery occurred, and Paquette, who was only tangentially involved in the robberies.[3] There was also testimony that Cormier traded pills to Hanson to purchase marijuana. In addition, Cormier directed that some of the stolen marijuana be given to Simpson, who did not participate in the robberies, to pay for Finch's bail. Furthermore, the evidence shows that Cormier requested the help of another person (Depka) in distributing drugs. Even though Depka later refused to help, that refusal does not negate Cormier's intent to distribute the drugs. Cf. United States v. Dixon, 449 F.3d 194, 202-03 (1st Cir. 2006) (holding that a sentencing guidelines enhancement "turns on a defendant's subjective intent, without regard to factual impossibility"). The quantity of marijuana retained by Cormier -- at least two pounds -- although not dispositive, at least suggests that it may not have been

---

[3] It is well accepted that drugs may be distributed by giving them away for free; 18 U.S.C. § 841(a)(1) imposes no requirement that a sale take place. See, e.g., United States v. Washington, 41 F.3d 917, 919 (4th Cir. 1994) (collecting cases).

-13-

intended only for personal use.  See United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) ("We have repeatedly held, and today reaffirm, that an intent to distribute drugs can legitimately be inferred from factors such as quantity and purity.").  Given the extent of the evidence, we believe that the jury reasonably concluded beyond a reasonable doubt that Cormier intended to distribute some of the drugs that he acquired, both to participants and nonparticipants in the robberies.  Thus, we reject Cormier's claim that the evidence was insufficient to prove his intent to distribute drugs.

### B.  Jury Instructions

As an analog to Cormier's argument regarding the sufficiency of the evidence, Cormier contends that the jury was misinstructed on how it should consider the evidence in light of United States v. Swiderski.  In Swiderski, the Second Circuit held that when "two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is personal drug abuse -- simple joint possession, without any intent to distribute the drug further." 548 F.2d at 450-51.  Swiderski goes on to explain that a defendant's joint, simultaneous acquisition of drugs with another does not bar a finding that the defendant intended to distribute the jointly acquired drugs, but rather, that more evidence will be needed to prove an intent to distribute.  Id. at 450.  As the

-14-

Second Circuit stated, "[w]hether such an inference [of intent to distribute] may be drawn depends upon the surrounding circumstances, including the nature of the relationship (whether it is commercial rather than personal), the quantity of the drug (whether it is too large for personal use only), the number of people involved, and statements or conduct on the part of the defendants." Id.

Cormier's argument on this point is subject to plain error review because his objection to the jury instructions was made only at the pre-charge colloquy and not after the charge and before deliberations. See United States v. Moran, 393 F.3d 1, 13 & n.7 (1st Cir. 2004). Cormier argues that it was plain error for the district court to instruct the jury that, to negate intent, Cormier needed to prove that he jointly and actually possessed drugs with another. Cormier contends that Swiderski is broader, providing that a defendant's intent to distribute drugs cannot be based solely on evidence of either joint actual or joint constructive possession of those drugs with a co-venturer -- i.e. possession shared with an accomplice or lookout. There is a dispute as to whether Cormier waived the objection. We will assume there was no waiver[4] and engage in plain error review. We will

[4] The Government argues that Cormier waived his objection to the jury instructions, and thus no review is possible. According to the Government, Cormier said, "No objection" after the judge read the charge, and thus intentionally waived his objection on the issue. See United States v. Hansen, 434 F.3d 92, 100-01 (1st Cir.

-15-

reverse if "(1) [] an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

We have never expressly decided whether Swiderski is good law in this circuit[5] and we decline to do so now because our resolution of Cormier's challenge to the sufficiency of the evidence shows that Cormier cannot satisfy the fourth prong of plain error review: the decision to not give Cormier's proposed Swiderski instruction did not seriously impair the fairness of his trial. Cormier cannot satisfy this fourth prong because the jury had sufficient evidence which showed beyond a reasonable doubt that Cormier intended to distribute drugs beyond the immediate participants in each robbery, which would satisfy the intent to distribute requirement of § 841(a)(1) even if we were to accept Cormier's understanding of Swiderski as correct. See United States

---

2006). Cormier responds that although his objection was improperly preserved, he did, in fact, object during the jury charge conference. Cormier states that "No objection" was intended as a response to the judge refusing the prosecutor's suggestion of an additional charge. Because it is unclear whether Cormier's statement was an unequivocal waiver of his objection to the jury instructions, we prefer to decide the issue on the merits.

[5] The only three cases in this circuit to have addressed Swiderski found that it was inapplicable to the facts. See United States v. Reid, 142 Fed. Appx. 479, 482 (1st Cir. 2005); United States v. Rush, 738 F.2d 497, 514 (1st Cir. 1984); United States v. Taylor, 683 F.2d 18, 21 (1st Cir. 1982).

-16-

v. <u>Taylor</u>, 683 F.2d 18, 21 (1st Cir. 1982) (finding <u>Swiderski</u> inapplicable given that "the complex nature of the operation and the amount of marijuana confiscated belies defendants' contention that they did not intend to transfer the drugs to other persons"). Because we find the evidence sufficient to establish Cormier's intent to distribute drugs, a jury instruction strictly tracking the language in <u>Swiderski</u> would have been of little help to Cormier, and as such, we cannot conclude that the failure to give such an instruction impaired the fairness of the proceedings.

## C. **Expert Testimony**

Cormier next claims that it was inappropriate for the court to admit the testimony of ATF Agent McSweyn regarding the provenance of the weapons used in the robberies. We review a district court's decision to admit testimony for abuse of discretion. <u>See</u> <u>United States</u> v. <u>McGauley</u>, 279 F.3d 62, 72 (1st Cir. 2002).

Fed. R. Evid. 702 allows a court to admit expert testimony regarding "scientific, technical, or other specialized knowledge" so long as the testimony is "based upon sufficient facts or data[,] . . . the product of reliable principles and methods, and . . . the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 703 states that "facts or data need not be admissible" if they are "of a type reasonably relied upon by experts in the particular field."

Cormier argues that ATF Agent McSweyn's testimony regarding the "interstate nexus" element of 18 U.S.C. § 922(g) was not admissible under Fed. R. Evid. 702 because it did not concern specialized knowledge, and that even if it did, the testimony failed to comply with Fed. R. Evid. 703 because McSweyn relied only upon impermissible facts and data in stating his conclusions.

In United States v. Corey, 207 F.3d 84 (1st Cir. 2000), we rejected an identical argument. We held that the "interstate nexus" element of § 922(g) constituted specialized knowledge for which expert testimony would be appropriate. Id. at 88-89. We further found that the evidence relied upon by the ATF agent in that case -- technical manuals, conversations with manufacturers, and the expert's prior experience -- was evidence reasonably relied upon by experts in the field. Id. at 91-92. In the present case, ATF Agent McSweyn relied upon the same evidence as was relied upon in Corey, but added to the mix dealer records, public and non-public ATF records, and inspection of one of the firearms. Cormier complains that ATF Agent McSweyn's testimony consisted only of a restatement of the conclusions made in public records. We agree with Cormier that "an expert witness may not simply summarize the out-of-court statements of others as his testimony." United States v. Smith, 869 F.2d 348, 355 (7th Cir. 1989). However, this is not what happened here. McSweyn not only consulted publicly available records in making his conclusions about the manufacturing origin of

-18-

the weapons, but he also looked to conversations with manufacturers and research texts, and he inspected one of the weapons. We see no reason why an expert in firearms identification could not reasonably rely on ATF manufacturing records to determine the provenance of a weapon. See United States v. Ware, 914 F.2d 997, 1003 (7th Cir. 1990) ("[E]xperts in the field of firearms identification rely on [ATF publications and lists] with regard to the issue of interstate transportation of firearms and such reliance is reasonable."). Thus, Cormier gives us no reason to depart from our conclusion in Corey that an ATF agent, using evidence reasonably relied upon by experts in that field, including publicly available records, may testify as to the interstate nexus element of a federal firearms offense.

## D. **Prosecutor's Opening and Closing Statements**

Lastly, Cormier calls our attention to comments made by the prosecutor during her opening and closing statements, which Cormier construes as improperly vouching for witnesses and criticizing his choice not to testify. We have fashioned a three-part test to determine whether a prosecutor's comments have so "poisoned the well" that a new trial must be ordered. United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999). We consider:

> (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether it is likely that any prejudice surviving the

-19-

judge's instruction could have affected the outcome of the case.

Id.

Cormier argues that the prosecutor improperly and repeatedly vouched for the credibility of witnesses. He specifically points to the fact that the prosecutor said three times during the opening that witnesses were "telling the truth." Further, Cormier argues, the prosecutor again vouched for the witnesses during her closing argument when she said that the witnesses "are worthy of their belief." Compounding these errors, Cormier argues, were the prosecution's comments regarding "Mr. Cormier's own words and actions" and "Mr. Cormier's own credibility." These comments, Cormier argues, were an indirect criticism of his choice not to testify at trial.

It is undisputed that the government is prohibited from placing the "prestige of the United States behind a witness by making personal assurances of credibility." United States v. Torres-Galindo, 206 F.3d 136, 140 (1st Cir. 2000). Likewise, it is clearly established that a prosecutor may not comment upon a defendant's choice to avail himself of his Fifth Amendment right to not testify at trial. Griffin v. California, 380 U.S. 609, 613 (1965); United States v. Roberts, 119 F.3d 1006, 1014 (1st Cir. 1997). The Government conceded that some of the prosecutor's statements vouched for certain witness' testimony. Furthermore, we agree with the district court that the prosecutor's statements,

-20-

although somewhat ambiguous, may have come "perilously close" to criticizing Cormier's choice to not testify. Given Cormier's frequent objections to these statements and that the prosecutor continued to make them, these comments constitute a serious error in judgment on the part of the prosecutor.[6]

We are mindful, however, of the Supreme Court's "admonition against letting the guilty go free to punish prosecutorial misconduct." United States v. Auch, 187 F.3d 125, 133 (1st Cir. 1999) (citing United States v. Hasting, 461 U.S. 499, 506-07 (1983)). To begin, the vigorous cross-examination of the prosecution witnesses, the court's instructions[7] to the jury to disregard the prosecutor's improper comments, and the passage of four days after the opening remarks were made, likely mitigated the impact on the jury of the prosecutor's initial improper vouching. See United States v. Rosales, 19 F.3d 763, 767 (1st Cir. 1994). Our concerns with the prosecutor's statement on closing are somewhat greater because of the possible cumulative effect of the improper comments and the fact that the prosecutor had already been censured for such comments during the opening. However, as we have recommended, the court issued "final instructions to the jury

---

[6]  Admirably, the Government conceded that at least some of the prosecutor's comments were "to be avoided." Appellee's Br. at 49.

[7]  Because there was a strong instruction at opening after the vouching, this case does not raise the question of measuring prejudice when there is vouching only at an opening statement which is not followed by an explicit curative instruction.

[that] were strong and clear" on their duty to disregard the improper comments and to properly weigh the credibility of witnesses. United States v. Rodríquez-Estrada, 877 F.2d 153, 159 (1st Cir. 1989). The fact that Cormier declined the court's offer of an additional instruction is also indicative of the lack of prejudice. Furthermore, this was not a case where the prosecution relied solely on the testimony of one or two witnesses, in which vouching could have had a particularly strong impact on the jury. Compare United States v. Manning, 23 F.3d 570, 575 (1st Cir. 1994) (finding that improper vouching affected a case where two prosecution witnesses had testified against the defendant and their testimony was challenged by two defense witnesses) with Torres-Galindo, 206 F.3d at 141-42 (1st Cir. 2000) (finding that vouching did not affect a case where there was consistent testimony implicating the defendant). Rather, the prosecution offered not only the testimony of Cormier's co-venturers, but also the testimony of victims of his robberies and other acquaintances, all of whom testified consistently regarding Cormier's actions. Finally, the prosecutor's statements regarding Cormier's choice not to testify were so vague and oblique that it was unlikely that they caused Cormier any real prejudice. Given the overwhelming evidence which implicates Cormier in the crimes of which he has been convicted, we cannot say that any prejudice surviving the curative instructions would have affected the outcome of the trial.

-22-

### III.  <u>Conclusion</u>

For the foregoing reasons, we affirm Cormier's conviction.

**<u>        Affirmed</u>**.