# United States Court of Appeals
## For the First Circuit

No. 12-1447

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ LUIS BOBADILLA-PAGÁN,
a/k/a José Luis Bombadilla-Pagán,

Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Baldock,[*] and Thompson,
Circuit Judges.

Anita Hill Adames for appellant.
John A. Mathews II, Assistant United States Attorney,
Appellate Division, with whom Rosa Emilia Rodríquez-Vélez, United
States Attorney, and Nelson Pérez-Sosa, Assistant United States
Attorney, Chief, Appellate Division, were on brief, for appellee.

March 28, 2014

_____

[*] Of the Tenth Circuit, sitting by designation.

**THOMPSON, Circuit Judge.** When ill luck began for José Luis Bobadilla-Pagán ("Bobadilla"), it came not in sprinkles, but in showers. First, Bobadilla had the misfortune to live one floor above his sketchy brother-in-law, suspected drug dealer Héctor Patrón. Second, when federal agents came looking for Patrón, Bobadilla went out to greet them. And third, the day the agents came, Bobadilla had left his driver's license in his minivan. As so often happens, one thing led to another, and soon enough the agents found the marijuana and unlicensed gun that Bobadilla had stashed in his vehicle. Bobadilla now comes before us appealing a jury verdict convicting him of possessing controlled substances with intent to distribute and possessing a firearm in furtherance of a drug trafficking offense. He says the evidence was insufficient to convict him of either crime. Because we disagree, we must reject his appeal.

BACKGROUND

We begin by recounting the facts in the light most flattering to the verdict, consistent with record support. See, e.g., United States v. Polanco, 634 F.3d 39, 40 (1st Cir. 2011); United States v. Echeverri, 982 F.2d 675, 676 (1st Cir. 1993).

Before dawn on September 27, 2011, Bobadilla and his wife were abruptly awakened by loud noises outside their home in Barrio Cacao, Carolina, Puerto Rico. U.S. Drug Enforcement Administration ("DEA") agents investigating a drug trafficking ring had shown up

at their house to search the ground-floor apartment of alleged drug dealer Patrón. Bobadilla and his wife lived in a separate apartment on the second floor. When they heard the commotion, they rushed outside to see what was going on. In retrospect, Bobadilla probably wishes he had stayed in bed. But without the benefit of 20/20 hindsight, he wandered directly into the agents' cross-hairs.

The agents asked Bobadilla who he was and how (or if) he knew their intended target, Patrón. Bobadilla gave his name and said that Patrón — who was not home at the time — was his wife's brother. When asked for his identification, he explained that his driver's license was in his minivan, which was parked a little ways down the road.[1] An agent went with him to get his license and bring it back to the house. And this was when Bobadilla's luck really took a turn for the worse.

Shortly thereafter, other agents brought a canine unit to check out Bobadilla's van. The dog alerted the agents to the presence of narcotics in the trunk. Bobadilla then gave permission for the agents to search the vehicle and also admitted there was marijuana inside.[2] With the agents watching, Bobadilla opened the

---

[1] At trial, one agent testified that parking far away from the house might indicate that Bobadilla was trying to hide or disassociate himself from the vehicle or its contents. Bobadilla insisted that he parked his van away from the house because its emergency brake did not work and his home was on a hill.

[2] Bobadilla filed a pre-trial motion to suppress evidence from the search, arguing his consent was coerced. The trial judge denied the motion. Bobadilla does not raise that argument again on

van and pulled a bag containing roughly 210 grams (about 7.5 ounces, or just under half a pound) of marijuana from beneath the driver's seat. He also let on that he kept an illegal firearm in the van and proceeded to fish out a partially loaded nine-millimeter Beretta from a fanny pack in the middle console. The gun was about three feet from where he stowed the marijuana, and both the gun and the drugs were within reach of the driver's seat. At the scene, Bobadilla told the agents that the marijuana belonged to him and said the gun was for his protection.

The only other things the agents found in the fanny pack with the gun were a single "Phillies" cigar, a nickel, a pack of gum, and some miscellaneous documents. They did not find any additional illicit or suspicious items in Bobadilla's minivan or his home, such as drugs, cash, or run-of-the-mill drug-processing paraphernalia, like scales or plastic bags. But, as we will see, what the agents had already found was enough to sink Bobadilla.

A couple of weeks later, the government charged Bobadilla with (1) possession of a controlled substance (specifically, a mixture or substance containing a detectable amount of marijuana) with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) ("Count One"); and (2) possession of a firearm in

---

appeal, and at oral argument Bobadilla's counsel conceded that consent-to-search was not at issue.

furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c) ("Count Two").

A two-day jury trial began on December 14, 2011. Among other witnesses, DEA Special Agent Christopher Díaz, a narcotics expert, testified on the government's behalf.[3] Agent Díaz was part of the team that seized the marijuana from Bobadilla's minivan. He observed that, when it was confiscated, the marijuana was wet, green, soft, and contained red hairs, stems, and seeds.[4] Based on its condition, he opined that the marijuana was not ready to be used that day; rather, it needed to be cured for several weeks in a cool environment and the stems and seeds needed to be removed before it could be smoked. He continued to say that — given the amount of marijuana, its rough condition, and the fact that it was stored in a large Ziplock bag in a hot van — he believed the marijuana was intended for distribution, not for personal use. Furthermore, when asked about the role of weapons in drug trafficking, Agent Díaz said that drug traffickers use firearms to

---

[3] Bobadilla objected at trial to Agent Díaz's qualification as an expert in the peculiarities of marijuana-smoking in Puerto Rico, but he does not renew this challenge on appeal. The government also called DEA Special Agent Ricardo Ramos, DEA Special Agent Marisol Pagán, and San Juan Municipal Police Officer Juan Valentín Marrero, who participated in the September 27 investigation; as well as DEA Senior Forensic Chemist Peter Echevarría, who tested the drugs confiscated from Bobadilla's van.

[4] By the time of trial, the marijuana had dried up and was less green.

protect themselves and their merchandise and sometimes even to kill people.

On cross, Bobadilla's counsel questioned Agent Díaz about the relationship between a Phillies cigar and marijuana. Agent Díaz responded that a Phillies cigar, like the one found in Bobadilla's van, could be used to smoke marijuana by removing the tobacco and replacing it with about 0.5 grams of marijuana. Later, based on this testimony, the government calculated that Bobadilla had enough marijuana to make a whopping 420 joints (by dividing the 210 grams of marijuana that he possessed into 0.5 grams per joint).

At the close of the government's case, defense counsel moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29"), arguing there was no evidence Bobadilla intended to distribute marijuana. See Fed. R. Crim. P. 29(a) ("The court . . . shall order the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction."). The trial judge denied the motion, noting (out of the jury's earshot) that there was "overwhelming evidence of distribution."

Bobadilla then took to the stand in his own defense. He stressed that the marijuana found in his van was for his own personal use and claimed he smoked between 10 and 12 joints per day, with each joint containing 1 to 2 grams of marijuana. He estimated that, after he removed the stems and seeds, the 7.5-ounce bag found in his car would yield only 5 or 5.5 ounces of usable

drug.  Thus, he figured he only had enough marijuana to make about 50 joints, which he said would last him a week or two.[5]  He explained that buying his marijuana in bulk was more economical, more convenient, and reduced the risk of getting caught.[6]

Continuing his direct testimony, Bobadilla admitted that what he said on the stand about his daily marijuana intake did not jibe with what he had told the pre-trial services officer the day he was arrested.  That day, having tested positive for marijuana as well as oxycodon (commonly known as "Percocet"), he had said he only smoked a single joint per day.[7]  While testifying, Bobadilla explained that he had lied to the officer because he was nervous and did not want to get in trouble.  In truth, he said, he smoked far more often than he had previously confessed.

---

[5] This math doesn't quite add up.  Even crediting Bobadilla's assertions that only 5 ounces — i.e., 140 grams — of the marijuana he had were usable and that he used 1 to 2 grams to make each joint, he possessed enough marijuana to make 70 to 140 joints. However, his point was that the government overestimated how many joints he could produce from the bag.

[6] To illustrate the risk of purchasing marijuana, Bobadilla volunteered his own arrest for possession of marijuana in the late 1990's as an example.  According to Bobadilla, he and two or three friends were stopped by police after one of the friends bought marijuana for them to share.  However, only the friend who purchased the marijuana was charged.

[7] Pre-Trial Services Officer Tanya Correa Hernandez, who conducted Bobadilla's pre-trial interview, confirmed that Bobadilla said he only smoked one joint per day and said that he appeared nervous during the interview.

Bobadilla went on to say that the illegal firearm in his minivan belonged to a friend who was traveling. He said he kept the gun in his van instead of in his house because he did not want his young daughter to find it.

On cross-examination, government counsel confronted Bobadilla about lying to the pre-trial services officer regarding his daily marijuana consumption. He also questioned Bobadilla's professed willingness to hold a gun for a "friend" — about whom Bobadilla would reveal few details — apparently without asking when the friend would collect the gun or why he needed Bobadilla to store it. Counsel further pressed Bobadilla as to how he could support such an expensive marijuana habit after losing his job as a civil engineer several months before his arrest. Counsel also challenged Bobadilla's assertion that he had no ties to his bad-news brother-in-law and neighbor, Patrón, for whom the agents were looking the day Bobadilla was arrested.

Government counsel went on to probe how Bobadilla could smoke so often without shirking his family responsibilities. In response to a series of questions about how Bobadilla managed to fit smoking 10 to 12 joints in his daily schedule, Bobadilla mentioned that he sometimes smoked marijuana with his friends. He

went on to admit that, on such occasions, he sometimes shared his own marijuana with those friends.[8]

Bobadilla's wife took the stand next on her husband's behalf. She testified that Bobadilla did not talk with her brother, Patrón. She said Bobadilla smoked marijuana all the time. She also said she had seen some Phillies wrappers in their apartment, though not "10, 20, 30, or 40" on a particular day.

At the end of trial, Bobadilla's counsel renewed his Rule 29 motion, again arguing there was absolutely no evidence of distribution. The trial judge denied the motion, and, after deliberating for roughly two hours, the jury convicted Bobadilla on both counts. After trial, Bobadilla filed a third Rule 29 motion and the judge again denied it.

On March 16, 2012, the judge sentenced Bobadilla, who had no prior convictions, to zero months for Count One (possession of a controlled substance with intent to distribute) and the statutorily mandatory sixty months (five years) for Count Two (possession of a firearm in furtherance of a drug trafficking offense). Judgment entered on March 19, 2012. Bobadilla timely appealed.

---

[8] Like many unfamiliar with the law, Bobadilla did not seem to realize that sharing drugs with friends, as we discuss later, qualifies as distribution. On re-direct, defense counsel attempted to clarify that Bobadilla did not sell marijuana to his friends, but, as the trial judge ruled, whether Bobadilla was compensated is not determinative.

## SUFFICIENCY OF THE EVIDENCE

On appeal, Bobadilla contends the government failed to present sufficient evidence to support his conviction on either count.

We review his preserved sufficiency claims de novo, considering the evidence, both direct and circumstantial, in the light most friendly to the verdict. United States v. Howard, 687 F.3d 13, 19 (1st Cir. 2012).[9] Our role at the stage is "quite limited." United States v. Cortés-Cabán, 691 F.3d 1, 12 (1st Cir. 2012) (quoting United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000)). It is not our job to re-weigh the evidence or second-guess the jury's credibility determinations. United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011). Rather, we will reverse only if we find that "even after 'crediting the government's witnesses and drawing all reasonable inferences in its favor,' no levelheaded jury could have found [Bobadilla] guilty" of the charged crimes. United States v. Guerrier, 669 F.3d 1, 7 (1st Cir. 2011) (quoting United States v. Aranjo, 603 F.3d 112, 116 (1st Cir. 2010)). In other words, if the verdict is "supported by a plausible rendition of the record," we must uphold it. Cortés-Cabán, 691 F.3d at 16 (quoting Hernández, 218 F.3d at 64).

---

[9] Sufficiency claims are preserved by moving for judgment of acquittal at the close of the government's case and at the end of trial, as Bobadilla did here. See United States v. Jones, 674 F.3d 88, 91 (1st Cir. 2012).

Because Bobadilla cannot surmount this formidable standard as to either count of his conviction, his appeal fails.

**A. Count One: Possession With Intent To Distribute**

First, Bobadilla says there was not enough evidence to convict him of possessing a controlled substance with intent to distribute.

In order to prove Bobadilla possessed a controlled substance with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D), "the government must show that [Bobadilla] knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute it." United States v. García-Carrasquillo, 483 F.3d 124, 129 (1st Cir. 2007). It is undisputed that Bobadilla possessed 210 grams of marijuana, a controlled substance. The question then is whether he possessed it with the requisite intent to distribute.

Courts, including this one, interpret the term "distribute" as used in 21 U.S.C. § 841(a)(1) quite broadly. Cortés-Cabán, 691 F.3d at 17-18 (collecting cases); see, e.g., United States v. Washington, 41 F.3d 917, 919 (4th Cir. 1994) ("[I]n enacting the 1970 Act, Congress intended to proscribe a range of conduct broader than the mere sale of narcotics."). The statute defines "distribute" as "to deliver . . . a controlled substance." Cortés-Cabán, 691 F.3d at 17 (quoting 21 U.S.C.

§ 802(11)).  "Deliver" is further defined as "the actual, constructive, or attempted transfer of a controlled substance." Id. (quoting 21 U.S.C. § 802(8)).  Nothing in the statute limits distribution to sale; rather, "[i]t is well accepted that drugs may be distributed by giving them away for free."  Id. at 19 (quoting United States v. Cormier, 468 F.3d 63, 71 n.3 (1st Cir. 2006)); United States v. Boidi, 568 F.3d 24, 29 (1st Cir. 2009).[10]

An inference of intent to distribute may be drawn from the circumstances surrounding possession, including the drug's quantity (i.e., whether it is too large for personal use only), the drug's purity, the defendant's statements or conduct, or the number of people involved and their relationship to the defendant.  See Cormier, 468 F.3d at 71 (quoting with approval the factors listed in United States v. Swiderski, 548 F.2d 445, 450 (2d Cir. 1977)); United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993) ("[A]n intent to distribute drugs can legitimately be inferred from factors such as quantity and purity.").  For example, with respect

---

[10] The Second Circuit has held that when "two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together, their only crime is personal drug abuse - simple joint possession, without any intent to distribute the drug further." United States v. Swiderski, 548 F.2d 445, 450 (2d Cir. 1977).  However, this court has never expressly decided whether Swiderski is good law in this circuit. Cormier, 468 F.3d at 72 & n.5 (explaining that "[t]he only . . . cases in this circuit to have addressed Swiderski found that it was inapplicable to the facts").  Moreover, the Swiderski court's holding is not on point here because Bobadilla does not contend he jointly acquired this marijuana with anyone else.

-12-

to drug quantity, in <u>Cormier</u>, this court found that the defendant's retention of at least two pounds (roughly 900 grams) of marijuana, "although not dispositive, at least suggests that it may not have been intended only for personal use." 468 F.3d at 71.[11] Likewise, in <u>Echeverri</u>, this court held that the quantity and purity of the drugs the defendant possessed — two pounds of eighty-six percent pure cocaine — were factors that supported the jury's finding of intent to distribute. 982 F.2d at 677, 678.

Here, at trial, the government presented the following evidence of Bobadilla's intent to distribute marijuana: (1) Bobadilla possessed 210 grams of marijuana, an amount that Agent Díaz testified indicated an intent to distribute; (2) the marijuana was wet and contained stems and seeds, which Agent Díaz said meant it was not ready for immediate consumption; (3) the marijuana was found about three feet away from an illegal partially loaded firearm, and Agent Díaz testified that drug traffickers sometimes use guns for protection; (4) agents seized the marijuana while executing a search warrant for a drug trafficking organization allegedly run out of the ground-floor apartment of Bobadilla's house (though there was no evidence directly connecting Bobadilla to that conspiracy); and (5) Bobadilla explicitly testified that he sometimes shared his marijuana with friends.

---

[11] We note, as did the government in its brief, that Bobadilla's brief misstated both the drug quantity at issue and the court's conclusions in this case.

Bobadilla, for his part, refutes each point and claims the marijuana was for his personal use only, citing the following evidence: (1) the 210 grams of marijuana seized was a "personal amount" that Bobadilla could consume on his own in just one or two weeks (though this differed from Bobadilla's statements to the pre-trial services officer after his arrest); (2) the marijuana's condition indicated good quality for Bobadilla's personal consumption; (3) the gun belonged to a friend and was not related to the marijuana found in Bobadilla's van; (4) Bobadilla was not a target of the drug trafficking investigation and had no relationship with his brother-in-law, Patrón; (5) Bobadilla's testimony about sharing marijuana with friends was unrelated to the particular marijuana seized here; and (6) unlike a "typical" drug dealer, Bobadilla voluntarily permitted police to search his van, where they found no other evidence of drug trafficking (e.g., scales, plastic bags, or large amounts of cash).

Though Bobadilla's explanation is plausible, so is the government's. Unfortunately for Bobadilla, this dual plausibility dooms his claim. See Cortés-Cabán, 691 F.3d at 16 (quoting Hernández, 218 F.3d at 64) (internal quotation marks omitted) ("[W]e must uphold any verdict that is supported by a plausible rendition of the record."). A reasonable jury crediting the government's witnesses and drawing reasonable inferences in its

favor could readily find that Bobadilla possessed marijuana with intent to distribute.

First, while the quantity of marijuana seized here does not overwhelmingly indicate an intent to distribute, Agent Díaz testified that the amount found was large enough to imply such intent, and the jury was entitled to believe him.  See United States v. Rivera-Rodríguez, 617 F.3d 581, 596 n.6 (1st Cir. 2010) (quoting United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009)) (assessing the credibility of a witness is a role reserved for the jury).  Furthermore, this court has previously found that possessing even a relatively small amount of marijuana might suggest an intent other than mere personal use.  See Cormier, 468 F.3d at 71.

Second, the jury could reasonably rely on the unprocessed condition of the marijuana when it was seized to infer that it had not yet reached its final user.  See Echeverri, 982 F.2d at 678 (explaining that purity is a factor from which intent to distribute may be inferred).

Third, the jury could rationally think that the nearby presence of an illegal gun — which, according to Agent Díaz, drug traffickers sometimes use to protect themselves or their product — showed Bobadilla intended to distribute the marijuana.  Though Bobadilla protests that he was holding the gun for a friend and the

gun bore no relation to the drugs in the van, as we will discuss further below, the jury was not required to believe him.

Fourth, the jury could determine that Bobadilla was a drug distributor independent of any possible connection to the drug trafficking organization allegedly run out of the ground-floor apartment of his house.

Finally, and perhaps most damagingly, Bobadilla's own statements that he sometimes shared marijuana with friends can be easily interpreted to indicate an intent to distribute the seized marijuana to others. See Cormier, 468 F.3d at 71 n.3 (recognizing that giving drugs away for free counts as distribution). Because the statutory term "distribution" is broader than sale and includes giving drugs away for free, see id., Bobadilla's statements are equal to an admission that he sometimes engages in the very conduct that the government said he intended to pursue here.

Considering the totality of this evidence, it is difficult to imagine how we could say that "no levelheaded jury" could have found as this jury did. See Guerrier, 669 F.3d at 7. But we take a moment to note that the evidence of distribution was by no means as "overwhelming" as the trial judge suggested. To recap the evidence to the contrary: The small amount of raw marijuana found in Bobadilla's van might very well have been intended solely for his personal enjoyment. Bobadilla's behavior when DEA agents descended upon his house was hardly reminiscent of

a sophisticated drug trafficker: He came outside to speak with the agents voluntarily, led them to the van where he stored the drugs and gun, and, when asked, freely copped to the contraband and retrieved it for the agents.  Other than his kinship tie to Patrón, there was nothing linking him to any drug trafficking organization.  And, beyond the drugs and the gun, none of the other trappings of a drug distributor — e.g., bags, scales, or cash — were found in Bobadilla's vehicle or apartment. In other words, the jury could easily have found that Bobadilla lacked the requisite intent to distribute.  But, because the evidence could plausibly support either conclusion, the choice was up to the jury.  Accordingly, Bobadilla's first attempt to undermine the jury's determination falls short, and we proceed to his second claim.

## B. Count Two: Possession "In Furtherance Of" Drug Trafficking

Second, Bobadilla maintains there was insufficient evidence to convict him of possessing a firearm "in furtherance of" a drug trafficking crime.

18 U.S.C. § 924(c)(1)(A) prescribes a mandatory minimum sentence for any person who, "during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." United States v. Pena, 586 F.3d 105, 112 (1st Cir. 2009) (quoting 18 U.S.C. § 924(c)(1)(A)).  To prove possession of a firearm "in furtherance of" a drug trafficking crime, "the government must prove that the

defendant: (1) committed a drug trafficking crime; (2) knowingly possessed a firearm; and (3) possessed the firearm in furtherance of the drug trafficking crime."  Id. (citing United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008)).

Here, Bobadilla first renews the claim we disposed of above that the evidence was insufficient to prove he possessed a controlled substance with intent to distribute — i.e., that he committed a drug trafficking crime.[12]  However, even assuming the first element is satisfied, and not contesting the second element of knowing possession, Bobadilla says there was insufficient evidence to make out the third element of the crime: that he possessed the firearm seized from his vehicle "in furtherance of" a drug trafficking crime.

To establish that a defendant possessed a firearm "in furtherance of" a drug trafficking crime, the government must show by specific facts "a sufficient nexus between the firearm and the drug crime such that the firearm advances or promotes the drug crime."  Id. at 113 (citing Marin, 523 F.3d at 27); United States v. Grace, 367 F.3d 29, 35 (1st Cir. 2004). Recognizing that "[t]he 'in furtherance of' element does not have a settled, inelastic

---

[12] "A 'drug trafficking' crime means any felony punishable under the Controlled Substances Act." United States v. Sherman, 551 F.3d 45, 49 n.3 (1st Cir. 2008) (citing 18 U.S.C. § 924(c)(1)(D)(2)).  This court has observed that possessing a controlled substance with intent to distribute is a drug trafficking crime. Id. (citing United States v. Luciano, 329 F.3d 1, 6 (1st Cir. 2003)).

definition," this court analyzes "in furtherance of" evidence from both objective and subjective standpoints.  Marin, 523 F.3d at 27. Objective factors the court considers include: (1) the proximity of the firearm to drugs or contraband; (2) whether the firearm was easily accessible; (3) whether the firearm was loaded; and (4) the surrounding circumstances.  Pena, 586 F.3d at 113 (citing United States v. Robinson, 473 F.3d 387, 399-400 (1st Cir. 2007)). Evidence of subjective intent might include a showing that a defendant obtained a firearm to protect drugs or proceeds.  See Marin, 523 F.3d at 27.  Where direct evidence of subjective intent is lacking, the jury may infer intent from the objective circumstances.  Id. at 28.

"The mere presence of a firearm in the area where the drug offense occurred is insufficient" to constitute possession "in furtherance of" a drug trafficking crime.  Pena, 586 F.3d at 113 (citing Grace, 367 F.3d at 35).  However, this court has shown considerable latitude in determining whether a firearm was sufficiently proximate to drugs or drug proceeds or accessible to support an "in furtherance of" conviction.  For example, in Grace, this court affirmed a conviction for possession "in furtherance of" a drug trafficking crime where the defendant kept an unloaded gun under a bed in a drawer that was blocked by a duffel bag, a trash can, and box of books, even though there was no ammunition in the house and the drugs were stored in a separate room.  367 F.3d at

31, 35-36.  There was also evidence that the defendant obtained the gun to protect the drugs she sold.  Id. at 36.  Likewise in Marin, this court affirmed a conviction where the defendant kept a loaded handgun in his bedroom where it was easily accessible to him and only a few feet away from the drugs he sold.  523 F.3d at 27-28.  In that case, "the jury also heard testimony that drug traffickers often possess firearms for protection of their trafficking activities."  Id. at 28.

Here, to establish a satisfactory nexus between the firearm seized from Bobadilla's van and his possession of marijuana with intent to distribute, the government musters the following: First, as objective factors, the government cites (1) the firearm was found in a fanny pack in Bobadilla's van's center console, within three feet of the marijuana seized from under the driver's seat; (2) the gun and the marijuana could be reached simultaneously; (3) the gun was loaded with three rounds (and could hold up to thirteen rounds); and (4) Bobadilla did not have a license for the gun and gave shaky testimony about how he acquired it - he said he was holding it for a friend, but he provided little other information about the circumstances.  Second, as subjective evidence, the government says Bobadilla specifically told officers at the time of his arrest that the gun was for "protection," an admission which dovetails with Agent Díaz's testimony that drug

traffickers sometimes use firearms to protect themselves, their drugs, or their profits.

Bobadilla attempts to counter this evidence as follows: First, Bobadilla says the objective factors here indicate only the "mere presence" of a gun in a van where marijuana was kept, not possession of a gun "in furtherance of" a drug trafficking crime. Other than the marijuana, no evidence related to the drug trade was found in the van. There was also no evidence that Bobadilla ever actually used or carried the gun. And the gun was only partially loaded when the police seized it - a "real" drug dealer, he says, might have kept the gun fully loaded. Second, as to his subjective intent, Bobadilla reiterates that he was holding the gun for a friend. He kept it in the van so his young daughter would not find it, rather than to protect himself or his stash.

Again, Bobadilla's explanation is plausible, but it does not overcome the extremely high bar set for a sufficiency challenge. Here, the evidence showed that Bobadilla kept a loaded, unlicensed firearm a few feet away from drugs concealed in his minivan. Moreover, the jury heard testimony that drug traffickers often possess firearms for protection of drug trafficking activities. From this evidence, the jury could rationally infer that Bobadilla possessed the firearm to protect his drug trafficking activities.

-21-

It was up to the jury to weigh the government's and Bobadilla's versions of the facts and to decide which to believe. See, e.g., Rivera-Rodríquez, 617 F.3d at 596 n.6. And, though we recognize that Bobadilla's second sufficiency-of-the-evidence challenge, like the first, presents a close question, it is not within our purview to disturb the jury's record-supported finding. See United States v. Sherman, 551 F.3d 45, 50-51 (1st Cir. 2008) (upholding a jury determination though "the sufficiency issue is arguably close"). Because, viewing the evidence in the light most favorable to the government, a reasonable jury could have found that Bobadilla possessed the firearm "in furtherance of" a drug trafficking offense, Bobadilla's second attempt to discredit the jury's verdict comes up short.

## CONCLUSION

Before we wrap up, we pause to make explicit our ambivalence towards the jury's findings. While it is clear that Bobadilla guiltily possessed a small quantity of marijuana and an illegal firearm, whether he intended to distribute that marijuana, as well as whether he possessed the firearm "in furtherance of" a drug trafficking crime, are harder questions. The jury answered "yes" to both. Another jury may have concluded otherwise. Obviously too, another prosecutor could have opted to indict Bobadilla on lesser charges, i.e., simple possession of marijuana and an unlicensed firearm. This prosecutor chose not to, as was

-22-

within her discretion.  And at this stage, we are duty-bound to enforce the jury's amply supported verdict.  Consequently, today, like September 27, 2011, is not Bobadilla's lucky day.

For the foregoing reasons, Bobadilla's conviction is <u>affirmed</u> as to both counts.

**-Concurring Opinion Follows-**

**BALDOCK, <u>Circuit Judge</u>, concurring**. I gladly join in the well-written and well-reasoned opinion of the Court.

I write separately because I do not join the dicta on the last page identified as "Conclusion." Rather than discuss hypothetical juries and prosecutors, I would simply conclude by stating "For the foregoing reasons, Bobadilla's conviction is <u>affirmed</u> as to both counts."