**UNITED STATES of America,**
**Plaintiff,**

v.

**Rene MARQUEZ–PEREZ, Defendant.**

**Criminal No. 13–885 (FAB).**

United States District Court,
D. Puerto Rico.

Signed Sept. 12, 2014.

Vanessa D. Bonano–Rodriguez, United States Attorney's Office, San Juan, PR, for Plaintiff.

Jedrick H. Burgos–Amador, San Juan, PR, Hector E. Guzman–Silva, Joannie Plaza–Martinez, Federal Public Defender's Office, Hato Rey, PR, for Defendant.

## OPINION AND ORDER

BESOSA, District Judge.

On December 12, 2013, a grand jury indictment charged Rene Marquez–Perez ("Marquez") with three counts of possession of narcotics with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Docket No. 12.) A jury trial commenced against Marquez on February 18, 2014. At the close of the government's evidence, Marquez moved for a judgment of acquittal as to all counts pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). (Docket No. 70.) After hearing arguments from both sides, the Court denied the Rule 29 motion. *Id.* At the close of the defendant's case, Marquez renewed his Rule 29 motion, which the Court again denied. *Id.* On February 26, 2014, a jury found Marquez guilty of all counts in the indictment. (Docket No. 74.) Marquez filed a timely [1] motion for judgment of acquittal pursuant to Rule 29 on April 7, 2014, arguing that the evidence presented at trial was insufficient to allow a reasonable jury to find him guilty of the charged offenses beyond a reasonable doubt. (Docket No. 89.) The government opposed the motion on April 28, 2014. (Docket No. 98.) For the reasons that follow, the Court **GRANTS in part and DENIES in PART** Marquez's motion.

## BACKGROUND

Without rehashing the entire trial here, the Court recounts background information and facts relevant to the legal analysis of Marquez's Rule 29 motion, *see United States v. Stierhoff,* 549 F.3d 19, 21 (1st Cir.2008), taking the facts in the light most favorable to the jury's verdict, *United States v. Rodriguez–Marrero,* 390 F.3d 1, 6 (1st Cir.2004).

In November, 2013, the Puerto Rico Police Department ("PRPD") received an anonymous complaint that triggered an investigation about Marquez. (Docket No. 54 at pp. 9–11.) PRPD Agents Angel Acevedo–Gonzalez and Angel Gutierrez, along with Officers Orlando Camacho and Ruben Colon–Perez, conducted surveillance of Marquez's residence in Aguadilla on November 18, 20, and 23, 2013. *Id.* at pp. 11–12, 16–17, 58. According to Agent Acevedo's account, on November 18, 2013, Marquez and an individual named Michael Salas ("Michael") [2] were outside Marquez's

---

1. A defendant may move the Court for judgment of acquittal within fourteen days after a guilty verdict or after the discharge of the jury, whichever is later. Fed.R.Crim.P. 29(c)(1). In this case, the guilty verdict and jury discharge occurred on February 26, 2014. (Docket No. 71.) On March 12, 2014, Marquez moved for, and the Court granted, an extension of time to file a Rule 29 motion until April 7, 2014. (Docket Nos. 77 & 78.) Because Marquez filed his Rule 29 motion on April 7, 2014, his motion is timely.

2. Because the government's witnesses referred to Michael Salas as "Michael"

residence when Marquez took a black fanny pack from the right back tire of a parked gray Mitsubishi Gallant; Marquez and Michael then got into a black Toyota Matrix and remained inside for several minutes. (Docket No. 54 at pp. 12–13.) Marquez exited the vehicle, talking on a cell phone, and went into his residence. He emerged holding a rolled-up handkerchief, which he hid in the back right tire area of the gray Mitsubishi. (Docket No. 54 at p. 15.) Marquez then left in the black Toyota Matrix. *Id.* Agent Acevedo testified that a typical form and manner of hiding controlled substances was on or inside car tires. *Id.* at p. 32.

On the afternoon of November 20, 2013, PRPD Agent Angel Gutierrez followed Marquez and Michael, who were driving in Marquez's Toyota Matrix, to Michael's residence. (Docket No. 57 at pp. 26–27.) Michael got out of the car holding a clear plastic bag containing dark cuttings, which Agent Gutierrez identified as marijuana. *Id.* at p. 27 lines 11–14. As Michael entered his residence, Marquez drove towards his mother's house. *Id.* at lines 15–21. Marquez parked in front of his mother's residence, and Agent Gutierrez observed him exit the vehicle and place a black firearm in his waistband. *Id.* at p. 31 lines 7–16. Agent Gutierrez testified that the weapon he saw on November 20 had the same characteristics of the weapon Marquez handled on November 23. *Id.* at p. 34 lines 3–5.

Agent Acevedo's video surveillance on November 20, 2013 showed Marquez and Michael entering Marquez's residence.

(Docket No. 54 at p. 34.) Marquez was holding a black fanny pack and a white bag. *Id.* Agent Acevedo identified the white bag as the same one (a black and white baseball bag) in which an AK–47 was later found at Marquez's mother's home. *Id.*

On the afternoon of November 23, 2013, Marquez and Michael were at Marquez's residence. (Docket No. 54 at p. 17.) A young man known as "Wicho" arrived and "called to"[3] Marquez. *Id.* At that moment, a dark-skinned man arrived and said to Marquez, "Give me the same thing." *Id.* at p. 18. Marquez went into his residence and came out holding a black pistol. *Id.* He handed the pistol to Wicho; Wicho charged the pistol and aimed it at the floor of the balcony and the wall. *Id.* According to Agent Acevedo, Wicho and Marquez appeared to be testing the firearm. *Id.* Wicho then returned the pistol to Marquez, and Marquez put it "in the area over the balcony." *Id.* Marquez, Wicho, and the dark-skinned man then walked to the black Toyota Matrix in the carport and conversed. *Id.* Marquez grabbed the pistol from the area over the balcony, placed it in his right pants pocket, and went inside his residence. *Id.* A few minutes later, a dark-skinned man arrived in a small burgundy car and called Marquez. *Id.* at p. 19. Michael came out from the residence and told him, "Give me four of crack."[4] *Id.* Michael went back into the residence with his right fist closed, returned, and opened his hand. The man took something from Michael's hand and handed him some money. *Id.* Later on, two more men arrived and called Marquez.

---

throughout the trial, the Court does the same here.

**3.** It is not clear from the transcript whether the people arriving at Marquez's home called out to Marquez, or called him on the phone.

**4.** While the text of the transcript seems to indicate that Michael said "Give me four of crack" to the dark-skinned man, the context of the subsequent occurrences indicates that it was the dark-skinned man who was seeking to purchase—and did purchase—drugs from Michael. *See id.* at p. 19 lines 1–8.

*Id.* at p. 20. One of the men told Marquez, "Give me two," after which Marquez walked to the black Toyota Matrix, opened the driver's door, and presented his closed fist to the man. *Id.* The man took something from Marquez's hand and hid it in his pocket. *Id.* Agent Acevedo concluded that, based on his 26 years of experience, the two interactions described were controlled substances transactions. *Id.* at pp. 19–20.

Afterwards, Marquez spoke to two men, one white-skinned and one dark-skinned. (Docket No. 54 at p. 21.) Marquez went again to the black Toyota Matrix, opened the driver's door, and took out a black fanny pack—the one that had been observed previously. *Id.* He approached the white-skinned man, opened the fanny pack, took out a medicine container, and handed it to the white-skinned man. *Id.* The man counted white pills and gave Marquez some money. *Id.* That same afternoon, a dark-skinned man arrived, called Marquez, and Marquez and Michael came out of the residence. *Id.* at p. 22. Michael handed something over to the dark-skinned man. Michael then went to the black Toyota Matrix, opened the driver's side door, re-emerged with his right fist closed, and handed something to the man. *Id.* Agent Acevedo again concluded that this was a controlled substance transaction, and that Marquez supervised the transaction. *Id.* at pp. 22 & 49. Next, a tall, white-skinned man arrived, and Marquez told him in a loud voice, "I have an AK with five maga-

zines. I will sell it for $5,000. Do you want to see it?" *Id.* at p. 22. Marquez showed the man pictures on his cell phone, and the man left. *Id.* Agent Acevedo testified that Marquez appeared to be showing pictures of the AK. *Id.* at p. 53. Then, Wicho returned to the residence and gave some money to Marquez. *Id.* at p. 22.

On November 27, 2013, PRPD agents executed search warrants of Marquez's home and car. (Docket No. 54 at p. 61.) Agents seized the following items pursuant to the search warrants: (1) a loaded, black 9 mm pistol, found on top of an air-conditioning unit in a bedroom; (2) a black, loaded .22 caliber rifle, found in a room in the home; (3) a black fanny pack from Marquez's black Toyota Matrix; and (4) two .45 caliber magazines. (Docket Nos. 54 at pp. 62–63; 59 at pp. 27, 30–31.) The fanny pack contained 45 baggies of crack cocaine, two bags of powder cocaine, 12 baggies of marijuana, 67 white pills, an empty .45 caliber magazine, and a container of small plastic bags.[5] (Docket Nos. 54 at p. 63; 59 at pp. 29–31, 51.) That same day, agents executed an additional search warrant of Marquez's mother's residence. (Docket No. 57 at p. 35.) There, agents seized an AK–47,[6] a pneumatic rifle,[7] eleven magazines,[8] 324 bullets of different calibers, cocaine, marijuana, crack, 187 pills, scales, empty baggies, a metal sieve, and black weights. (Docket Nos. 57 at p. 44 lines 1–6; 66 at pp. 11–14, 24–25, 44.) The pneumatic rifle was located under Marquez's mother's bed (Docket No. 66 at p.

---

5. PRPD Agent Ruben A. Colon Perez testified that, based on his experience, the bags were the kind used to prepare controlled substances for distribution. (Docket No. 59 at p. 31 lines 7–15.)

6. The AK–47 had several added "upgrades" to the manufactured model: a scope, flashlight, and expandable arm. (Docket No. 66 at pp. 14, 139 at lines 15–19.) Additionally, the rifle's flash suppressor had been removed,

and it had seven high capacity magazines. *Id.* at pp. 140–41.

7. This was also referred to as a "pellet gun" at trial. (Docket No. 66 at p. 15 line 5.)

8. Of the magazines, seven were loaded, extended AK–47 magazines, and four were AR–15 magazines. (Docket No. 57 at p. 44 lines 1–4.)

15), while the remaining items were found inside four bags behind wood panels in a room under construction. *Id.* at pp. 10–12. One of the four bags was the black and white baseball bag Marquez was seen carrying on November 20, 2013. (Docket No. 54 at p. 34.)

Later that same day, Homeland Security Investigations agent Felix Perez interviewed Marquez. (Docket No. 69 at p. 5.) Marquez told Agent Perez that he made a living by selling drugs. *Id.* at p. 12 lines 2–4. Marquez also stated that all the drugs and firearms seized belonged to him. *Id.* at lines 10–12.

### DISCUSSION

### I. Rule 29 Standard

■ A court may enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. Fed.R.Crim.P. 29(c). In reviewing a Rule 29 motion for judgment of acquittal, a district court must consider the evidence, both direct and circumstantial, "in the light most favorable to the prosecution" to determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt." *United States v. Lara,* 181 F.3d 183, 200 (1st Cir.1999) (citations omitted). This standard requires the Court to eschew all credibility judgments and draw all reasonable inferences in favor of the government's case. *United States v. Savarese,* 686 F.3d 1, 8 (1st Cir.2012); *United States v. Sepulveda,* 15 F.3d 1161, 1173 (1st Cir.1993). Thus, the jury's verdict stands unless the evidence could not have persuaded a rational trier of fact of the defendant's guilt beyond a reasonable doubt. *United States v. Soler,* 275 F.3d 146, 150 (1st Cir.2002) (citing *Lara,* 181 F.3d at 200).

### II. Sufficiency of the Evidence

### A. Marquez's Confession to Agent Perez

■ Before turning to the specific offenses that Marquez contests, the Court addresses the final argument in Marquez's Rule 29 motion: that he admitted to owning only the firearms seized, but not the drugs. (Docket No. 89 at pp. 9–10.) Agent Perez's testimony regarding Marquez's interview reads as follows:

> **A.** And then I asked him how did he make [sic] a living, and he responded he sells narcotics, he sells drugs. In Spanish he told me that "I sold drugs."
>
> **Q.** Did he mention something else?
>
> **A.** Well, right after that, I asked him about the seizure that the search warrant, the weapons that were seized, if he knew who that belonged to. And he freely told me that that belonged to him.
>
> **Q.** So he admitted that the drugs and the firearms that were seized were his?
>
> **A.** Yes, he did.

(Docket No. 69 at p. 12 lines 2–12.)

According to Marquez, Agent Perez testified that Marquez only admitted to ownership of the firearms, but that the prosecutor used a leading question to evince the conclusion that Marquez had admitted to the ownership of both the guns and the drugs. The government responds that the testimony indicates that Marquez admitted to owning everything that was seized. (Docket No. 98 at pp. 9–10.) Though Marquez's explanation is plausible, so is the government's. Unfortunately for Marquez, however, at this stage, such "dual plausibility dooms his claim." *United States v. Bobadilla–Pagan,* 747 F.3d 26, 33 (1st Cir.2014). A reasonable jury could have accepted Agent Perez's last characterization of Marquez's statement as true, particularly in the absence of any objection

from defense counsel. The Court is bound to resolve any ambiguity in favor of the government, and accordingly interprets Agent Perez's testimony to be that Marquez admitted ownership of the guns and drugs seized.

### B. Counts One through Three: Possession with Intent to Distribute Controlled Substances

■ To prove that a defendant possessed a controlled substance with intent to distribute, "the government must show that the defendant[ ] knowingly and intentionally possessed, either actually or constructively, a controlled substance with the specific intent to distribute." *United States v. Garcia–Carrasquillo,* 483 F.3d 124, 130 (1st Cir.2007) (citing *United States v. Lopez–Lopez,* 282 F.3d 1, 19 (1st Cir.2002)). A person constructively possesses an object when he or she knowingly has the power and intention to exercise dominion and control over the object, directly or through others. *United States v. McLean,* 409 F.3d 492, 501 (1st Cir.2005). While a person's mere presence on the property where drugs are found, proximity to the drugs seized, or association with the actual possessor does not establish constructive possession, circumstantial evidence may be used to show constructive possession. *Garcia–Carrasquillo,* 483 F.3d at 130 (citing *United States v. Echeverri,* 982 F.2d 675, 678 (1st Cir.1993) and *United States v. Barnes,* 890 F.2d 545, 549 (1st Cir.1989)). "An inference of intent to distribute may be drawn from the circumstances surrounding possession, including the drug's quantity (*i.e.* whether it is too large for personal use only), the drug's purity, the defendant's statements or con-

duct, or the number of people involved and their relationship to the defendant." *Bobadilla–Pagan,* 747 F.3d at 33.

Drugs were seized from two locations: (1) the black fanny pack found in Marquez's car, and (2) a room in Marquez's mother's house. The Court addresses each location in turn.

#### 1. The Fanny Pack

■ As to the fanny pack, Marquez advances three arguments. First, he argues that he and Michael had joint possession over the fanny pack, and the evidence did not demonstrate that either of them controlled it on the date in the indictment— November 27, 2013. (Docket No. 89 at pp. 2–3.) The government responds that a reasonable jury could have concluded that Marquez possessed the fanny pack on or around November 27, 2013. (Docket No. 98 at p. 2.) The Court agrees. To start, the jury could have relied on Marquez's confession that the drugs seized were his to conclude that he possessed the fanny pack—and the drugs within—on November 27, 2013. Additionally, Agent Acevedo testified that Marquez retrieved, handled, and hid the fanny pack on November 18, 20, and 23,[9] in front of his home and in a manner consistent with hiding controlled substances. (Docket No. 54 at pp. 12–13, 21, 34.) Further, on November 27, 2013, the fanny pack was seized from Marquez's car, which Marquez was seen driving on more than one occasion. *Id.* at p. 63. From this evidence, it was reasonable for the jury to conclude beyond a reasonable doubt that Marquez knowingly had the power and intention to exercise dominion and control over the fanny pack, directly

---

**9.** The jury instructions explained that to show that the charged offenses were committed "on or about" November 27, 2013, the government had "to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the dates alleged in the Indictment," but not "precisely on the dates charged." (Docket No. 72, p. 20 instruction # 11.)

or through Michael, and thus had constructive possession of the fanny pack. *See McLean*, 409 F.3d at 501. Additionally, the jury heard evidence that Marquez earned his living by selling drugs. (Docket No. 69 at p. 12 lines 2–12.) Because "[b]oth constructive possession and guilty knowledge may be inferred from a defendant's dominion and control over an area where narcotics are found," *Echeverri*, 982 F.2d at 678, the jury could have reasonably inferred that Marquez's dominion and control over his home and car indicated that he possessed both the fanny pack and the drugs found inside of it.

■ Second, Marquez contends that while the evidence shows that he sold pills,[10] and that Michael sold controlled substances, the evidence does not establish that Marquez sold controlled substances. (Docket No. 89 at p. 3.) The Court finds that the government presented sufficient evidence to support the jury's conclusion that Marquez took part in the drug transactions outside his home, or at least intended to participate in future drug transactions. The drugs seized in the fanny pack were packaged in small baggies so as to indicate they had been prepared for distribution. (Docket No. 54 at p. 63.) Moreover, the jury was free to believe Agent Acevedo's testimony that Marquez on more than one occasion hid controlled substances, sold controlled substances, and supervised Michael as he engaged in controlled substances transactions. *Id.* at pp. 15, 20, 31–32, 49. Again, this evidence, coupled with Marquez's admission that he earned a living by selling drugs, was sufficient to support a reasonable jury's conclu-

sion that Marquez himself not only had the intent to distribute controlled substances, as required by the statute, but actually sold them.

■ Last, Marquez avers that even if the Court were to assume that he had possession of the fanny pack on the indicted date, the quantity of drugs seized was insufficient to show an intent to distribute. (Docket No. 89 at p. 3.) Marquez points to no authority that would indicate that the quantity[11] of drugs found in the fanny pack—12 baggies of marijuana, two bags of cocaine, and 45 baggies of crack—is insufficient as a matter of law to support an inference of intent to distribute. Common sense dictates otherwise. In addition to the relatively large quantity of drugs seized, the jury could have reasonably concluded that the circumstances surrounding the drug possession—such as the drugs being packaged for distribution, the stream of seeming customers that approached Marquez's residence, Marquez's hiding the fanny pack, and Marquez's confession to dealing drugs—established his intent to distribute beyond a reasonable doubt. *See Bobadilla–Pagan*, 747 F.3d at 33.

### 2. Marquez's Mother's Residence

■ Marquez contends that the only evidence tying Marquez to his mother's house is Agent Gutierrez's testimony that he saw Marquez arrive at the home on one occasion with a pistol in his waistband. Marquez claims that no evidence indicates that the drugs seized belonged to him, or that he had dominion and control over the area that was seized. Marquez again ar-

---

10. Marquez was not indicted for distribution of prescription pills. (*See* Docket No. 12.) Thus, any evidence that Marquez sold pills is not probative of the charges that Marquez sold—or intended to sell—controlled substances.

11. Because neither party advances arguments regarding the specific drug weights, the Court refers generally to the quantity of packages in which drugs were found in its discussion of drug quantity.

gues that the amount of controlled substances seized was insufficient to trigger an inference of intent to distribute. (Docket No. 89 at pp. 3–4.)

Again, the most incriminating evidence that Marquez possessed the drugs seized from his mother's house was his confession. In addition to the confession, the government presented sufficient circumstantial evidence to permit the jury to infer Marquez's possession of the drugs beyond a reasonable doubt. The drugs were found in four bags behind wooden panels in a room under construction at Marquez's mother's house. (Docket No. 57 at pp. 35, 44.) Video surveillance on November 20, 2013, showed Marquez carrying one of the four bags found behind the wooden panels—a black and white baseball bag—into his home (Docket No. 54 at p. 34), indicating his ownership of that particular bag. Further, Agent Acevedo described an encounter on November 23, 2013, in which Marquez offered to sell a man his AK for $5,000, and then seemed to show the man pictures of the weapon on his cell phone. *Id.* at pp. 22, 53. The jury could have reasonably inferred that the AK–47 found in the black and white bag on November 27, 2013 was the same one Marquez discussed on November 23, further indicating his ownership of the bag and the AK–47, and supporting a conclusion that he also possessed the surrounding bags and drugs.

As to Marquez's intent to distribute the drugs seized at his mother's house, the jury had sufficient evidence to support a finding of guilt. The drugs were found alongside drug-packaging paraphernalia: scales, empty baggies, a metal sieve, and black weights. (Docket Nos. 57 at p. 44 lines 1–6; 66 at pp. 11–14, 24–25, 44.) The jury could have reasonably credited Officer Miguel Arrocho–Irizarry's testimony that that type of paraphernalia is used to pre-pare drugs for distribution. *Id.* at p. 12. Finally, the jury could have reasonably relied on Marquez's admission that he made a living by selling drugs to conclude that these particular drugs were also possessed by him in furtherance of his trade.

In conclusion, considering the totality of the evidence with regards to the fanny pack and the drugs seized from Marquez's mother's house, it is clear that a reasonable jury could have found Marquez guilty of possession of controlled substances with intent to distribute beyond a reasonable doubt. Accordingly, the Court **DENIES** Marquez's motion for a new trial as to counts one, two, and three.

### C. Count Four: Possession of a Firearm in Furtherance of a Drug Trafficking Crime

Marquez maintains there was insufficient evidence to convict him of possessing a firearm "in furtherance of" a drug trafficking crime. (Docket No. 89 at p. 4.) Title 18 U.S.C. § 924(c) prescribes a mandatory minimum sentence of five years imprisonment for any person who, "during and in relation to any . . . drug trafficking crime, . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). At trial, the government's theory centered on Marquez's possession of three firearms "in furtherance of" a drug trafficking crime. (*See* Docket No. 98 at p. 5.) Thus, the government had to show that Marquez "(1) committed a drug trafficking crime; (2) knowingly possessed a firearm; and (3) possessed the firearm in furtherance of the drug trafficking crime." *United States v. Pena*, 586 F.3d 105, 112 (1st Cir.2009) (internal citation omitted). The "in furtherance" element requires the government to establish "a sufficient nexus between the firearm and the drug crime such that the firearm advances or pro-

motes the drug crime." *Id.* at 113 (internal citation omitted).

■ Because "the 'in furtherance of' element does not have a settled, inelastic definition," the Court looks at several objective and subjective factors to determine whether the nexus was sufficiently proven. *United States v. Marin,* 523 F.3d 24, 27 (1st Cir.2008). Objective factors include "(1) the proximity of the firearm to drugs or contraband; (2) whether the firearm was easily accessible; (3) whether the firearm was loaded; and (4) the surrounding circumstances." *Bobadilla–Pagan,* 747 F.3d at 35 (citing *Pena,* 586 F.3d at 113.) Indication of subjective intent includes, for example, evidence that a defendant acquired a firearm in order to protect drugs or drug proceeds. *Bobadilla–Pagan,* 747 F.3d at 35. "Where direct ·evidence of subjective intent is lacking, the jury may infer intent from the objective circumstances." *Id.* (citing *Marin,* 523 F.3d at 28).

■ "The mere presence of a firearm in the area where the drug offense occurred is insufficient to constitute possession 'in furtherance of' a drug trafficking crime." *Bobadilla–Pagan,* 747 F.3d at 35 (internal quotation marks and citation omitted). "Mere presence," when coupled · with evidence of subjective intent, however, can be sufficient to support a finding of possession "in furtherance of." *See, e.g., United States v. Marin,* 523 F.3d 24, 27–28 (1st Cir.2008) (sustaining an "in furtherance of" conviction where the defendant kept a loaded handgun in his bedroom, easily accessible to him and only a few feet from the drugs he sold, and where the jury heard testimony that drug traffickers possess firearms in order to protect their drug trafficking activities); *United States v. Grace,* 367 F.3d 29, 31–36 (1st Cir.2004) (affirming an "in furtherance of" conviction where an unloaded gun was found under a bed in a drawer blocked by a duffel bag, trash can, and box of books, though there was no ammunition in the house and the drugs were found in a separate room, but there was evidence that the defendant acquired the gun to protect the drugs she sold).

■ Here, agents seized three different firearms from two different locations. Marquez admitted that they all belonged to him, satisfying the "knowing possession" element. Further, as explained above, the Court finds that sufficient evidence existed for the jury to convict Marquez of possession of drugs with the intent to distribute, satisfying the drug trafficking element of the current count. Accordingly, the only issue that remains is whether Marquez possessed any or all of these firearms "in furtherance of" a drug trafficking crime.

At trial, the government presented evidence that two loaded firearms—a black pistol and a rifle—were seized from Marquez's home, and that Marquez had conducted drug transactions from his home. (Docket Nos. 54 at pp. 62–63; 59 at pp. 27–31.) Additionally, on November 23, 2013, Marquez tested the pistol with Wicho outside of Marquez's residence shortly before a controlled substances transaction occurred in the same location. (Docket No. 54 at pp. 17–20.) Officers also seized a fanny pack from Marquez's car that contained both drugs and an empty .45 caliber magazine. (Docket Nos. 54 at p. 63; 59 at pp. 29–31, 51.) The government presented evidence that Marquez carried the black pistol and drugs in his car. (Docket No. 57 at pp. 27, 31, 34.) Finally, Agent Colon testified that based on his experience, a weapon such as Marquez's pistol is typically used by drug traffickers "to protect themselves at their drug distribution points to defend themselves from their enemies." (Docket No. 59 at pp. 57–58.)

Thus, from the evidence presented at trial, the jury could have inferred that Marquez used the pistol in furtherance of drug trafficking crimes.

Marquez argues that the evidence shows that his sole intent with regard to the pistol was to sell it. He further contends that had he intended to use the firearm to protect his drug trade, he would have carried it in the fanny pack with the drugs. Finally, Marquez claims that he carried the pistol to protect himself and his home.[12] (Docket No. 89 at pp. 6–7.) While these explanations are certainly plausible, they do not foreclose the jury's conclusion that Marquez possessed the pistol in furtherance of his drug trafficking activities. These explanations go towards Marquez's subjective intent, but do not rebut the evidence produced regarding the objective factors, such as the pistol's proximity to drugs, its accessibility, the fact that it was loaded, and the surrounding circumstances of drug transactions being conducted from Marquez's residence. *See Bobadilla–Pagan,* 747 F.3d at 35 (citing *Pena,* 586 F.3d at 113).

■ The government also presented sufficient evidence to allow a reasonable jury to conclude that Marquez possessed his AK–47 "in furtherance of" a drug trafficking crime. The weapon was found in the same location as a large quantity of drugs, drug paraphernalia, and bullets. (Docket No. 57 at p. 44.) Marquez's argument—that he intended to sell the AK–47,

rather than use it to protect his drug business—again only goes to his subjective intent, and does not rebut the objective factors the Court considers. While plausible, Marquez's explanation does not surmount the high bar set by a Rule 29 challenge. The jury was tasked with weighing the government's and defense's differing accounts and deciding which ultimately to believe. *See Bobadilla–Pagan,* 747 F.3d at 36. Because a reasonable jury—crediting the government's witnesses and drawing inferences in its favor—could have concluded that Marquez possessed the pistol and the AK–47[13] in the furtherance of a drug trafficking crime, the Court **DENIES** Marquez's motion for a new trial as to count four.

**D. Count Five: Possession of a Firearm by a Convicted Felon**

■ Marquez was convicted of violating 18 U.S.C. § 922(g), which prohibits anyone who has been convicted by any court of a "crime punishable by imprisonment for a term exceeding one year" from possessing a firearm or ammunition. 18 U.S.C. § 922(g)(1). At trial, the government produced evidence that Marquez was convicted of violating article 3.1 of Puerto Rico's Law 54 in 2000. (Docket No. 79–7.) At the time of Marquez's conviction, article 3.1 provided that the crime was punishable "by imprisonment for a fixed term of twelve (12) months, unless there are extenuating circumstances, when it may be re-

---

**12.** In support of his self-defense argument, Marquez cites *Currier v. United States,* 320 F.3d 52 (1st Cir.2003). There, the First Circuit Court of Appeals—in an ineffective assistance of counsel analysis—noted that, "[w]hile at least in theory, there may be situations in which a person justifiably ... uses a gun to facilitate a drug trafficking offense, we are confident that, if they exist at all, such situations are few and far between." *Id.* at 57. Far from supporting his argument, this case all but rules out the possibility that a self-

defense claim could provide a legally sufficient basis for granting a Rule 29 motion.

**13.** The Court does not find sufficient evidence in the record to support a reasonable jury's conclusion that the rifle was used in furtherance of a drug trafficking crime. Because all three rifles were charged in one count, however, this insufficiency does not impact the verdict.

duced to a term of not less than nine (9) months, and if there were aggravating circumstances, it may be increased to eighteen (18) months." P.R. Laws Ann. tit. 8 § 631 (1989).

Marquez contends that because the statute provided for a fixed, twelve-month term of imprisonment, his conviction was insufficient to satisfy the felony element of section 922(g). (Docket No. 89 at pp. 8–9.) In support of this argument, Marquez cites a Puerto Rico Supreme Court decision, *Pueblo v. Santa Velez*, 177 D.P.R. 61 (2009),[14] that considered a criminal statute with identical language [15] to the statute at issue here regarding the sentence to be imposed. The Puerto Rico Supreme Court held that the statute imposed a *fixed* term of one year, and that the sentencing judge did not have discretion to impose a greater or lesser sentence based only on the jury's finding of guilt. *Santa Velez*, 177 D.P.R. 61. "For a judge to be able to impose a higher or lower penalty to the one-year fixed term there *must* be a finding of aggravating or mitigating circumstances. With the guilty verdict by a Jury alone, the judge can only impose the fixed penalty." *Id.* (certified translation attached.) Relying on the United States Supreme Court's rulings in *Apprendi v. New Jersey,*

530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Cunningham v. California,* 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007), the court concluded that the sentencing judge cannot impose a sentence greater than the fixed twelve-month statutory term where a jury has not found the existence of aggravating circumstances beyond a reasonable doubt. *Id.* ("If it is in the Prosecution's best interest to have a penalty imposed with aggravating circumstances during the resentencing process, it shall be necessary for the lower court to holds [sic] a hearing for this purpose before a jury, and that these factors be proven beyond a reasonable doubt.")

The government argues that *Santa Velez* does not apply here, where the defendant's underlying conviction was by way of guilty plea. The government cites no authority suggesting that any distinction exists between convictions pursuant to guilty pleas and convictions pursuant to jury verdicts. The government then argues that "the qualification of a prior conviction does not depend on the sentence a defendant actually received but on the maximum sentence that he could have received for his conviction." *United States v. Cozart,* 496 Fed.Appx. 280, 282 (4th Cir.2012) (citing

---

**14.** The government, in a footnote, objects to Marquez's reliance on an untranslated Spanish-language decision of the Puerto Rico Supreme Court, in contravention of 48 U.S.C. § 864 ("all pleadings and proceedings in the United States District Court for the District of Puerto Rico shall be conducted in the English language.") and *Puerto Ricans for P.R. Party v. Dalmau,* 544 F.3d 58, 67 (1st Cir.2008)("[T]he failure of defendants to provide a translated copy of a critical decision alone warranted denial of their motion."). In light of more recent First Circuit Court of Appeals precedent, the Court declines to ignore binding Puerto Rico law, and opts instead to consider the substance of the Puerto Rico Supreme Court decision at issue. *See Berrios–Romero v. Estado Libre Asociado de P.R.,* 641 F.3d 24, 27 (1st Cir.2011) (noting that "[a] decision of

a sister court is a proper matter of judicial notice" and taking judicial notice of a Puerto Rico appellate court decision as law). In any event, the Court has had the relevant portion of case translated, and attaches a certified translation to this opinion. (*See* Attachment).

**15.** The statute considered in that case stated that the offense was punishable with "a penalty of one (1) year imprisonment.... If there are aggravating circumstances involved, the fixed penalty may be increased up to a maximum penalty of three (3) years; if there are mitigating circumstances involved, the penalty may be reduced up to a minimum of six (6) months and one day." *Id.* (citing P.R. Laws Ann. tit. 33 § 4005 (1983)).

*United States v. Edmonds*, 679 F.3d 169, 176 (4th Cir.2012)). *See also United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011) (when determining whether a prior state court conviction qualifies as a predicate felony for federal purposes, federal courts must examine the maximum sentence that the state could have imposed on a person with that particular defendant's actual criminal history and level of aggravation.)

█ The government's arguments miss the mark. In examining the maximum sentence that Marquez could have received, the Court is forbidden "from considering hypothetical aggravating factors" or " 'facts outside the record of conviction [that] could have authorized' a conviction of a crime punishable by more than one year's imprisonment." *Simmons*, 649 F.3d at 244–45 (quoting *Carachuri–Rosendo v. Holder*, 560 U.S. 563, 582, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010)). Puerto Rico Supreme Court precedent clarifies that the statutory language for the statute under which Marquez was convicted mandates a fixed-term twelve-month sentence. *Santa Velez*, 177 D.P.R. 61. Imposition of a greater sentence (up to eighteen months) would have required a jury finding of aggravating circumstances beyond a reasonable doubt. *Id.* Because Marquez's conviction "makes clear that he was neither charged with nor convicted of an aggravated offense," *see id.*, those enhancements may not be considered in determining whether his offense constitutes a predicate for section 922(g). The evidence presented at trial establishes that Marquez was convicted of an offense punishable by a one-year term of imprisonment; his prior conviction was thus insufficient to support the predicate conviction element of section

922(g). Accordingly, the Court **GRANTS** Marquez's motion for judgment of acquittal as to count five, and **VACATES** Marquez's conviction for count five.[16]

### III. Conclusion

For the reasons articulated above, the Court **GRANTS in part and DENIES in part** Marquez's Rule 29 motion. (Docket No. 89.) As to count five, the Court **GRANTS** Marquez's motion and **VACATES** Marquez's conviction for that count. The Court **DENIES** Marquez's motion as to counts one through four.

**IT IS SO ORDERED.**

Certified Translation

Janis Palma, USCCI

*Pueblo v. Santa Velez*, 177 D.P.R. 61 (2009)

2009 TSPR 158

177 D.P.R. 61, 2009 WL 3488357 (P.R.), 2009 TSPR 158

EL PUEBLO DE PUERTO RICO, appellee,

v.

JAIME SANTA VÉLEZ, appellant.

In the Puerto Rico Supreme Court.

*Number:* CC–2007–65

( . . . . . . . . . )

### III

█ As opposed to the 2004 Criminal Code, in which the penalties are determined by the offense's degree, the 1974 Criminal Code established a set penalty for each crime, which could vary depending on whether there were any aggrava-

---

**16.** Having granted Marquez's motion on the basis of the predicate offense, the Court need not entertain Marquez's arguments regarding the interstate commerce nexus. (*See* Docket No. 89 at p. 9.)

ting or mitigating circumstances. Thus, the crime of manslaughter as codified therein, in its pertinent portion, states:

When manslaughter is committed by someone while driving a motor vehicle, *a penalty of one (1) year imprisonment shall be imposed. If there are aggravating circumstances involved, the fixed penalty may be increased up to a maximum of three (3) years; if there are mitigating circumstances involved, the penalty may be reduced up to a minimum of six (6) months and one day.* The court may impose restitution in addition to the established imprisonment term, or both penalties. (Emphasis added.) Art. 86 of the 1974 Criminal Code (33 L.P. R.A. sec. 4005 (1983 ed.))

■ As one reads that article, one sees that the crime of manslaughter, when caused while driving a motor vehicle, carries a *fixed* penalty of one year. For a judge to be able to impose a higher or lower penalty to the one-year fixed term there *must* be a finding of aggravating or mitigating circumstances. With a guilty verdict by a Jury alone *73, the judge can only impose the fixed penalty. Therefore, the statutory limit according to *Apprendi* and *Cunningham* is the fixed term of one year. Notice that the judge has no discretion to impose any other penalty unless there is a finding of additional facts beyond the jury's verdict, since the article in question establishes that "imprisonment *shall be imposed* for a *fixed* term of one year." The article does not say that the judge *may* impose, but rather orders the imposition of said fixed penalty, limiting the judge's discretion in this exercise. In

that sense, the text of the law is compulsory, not voluntary, and therefore the judge has an obligation to impose the fixed penalty in the absence of any mitigating or aggravating circumstances.

■ The limitations on the judge's discretion when imposing penalties stem from the 1974 Criminal Code itself, in its General Part. Thus, Article 58 of that body of laws establishes:

When the court sentences to a prison term, the sentence shall be precise, with a specific duration. *In felony cases, the fixed term established by law for the crime shall be imposed.* Should there be any aggravating or mitigating circumstances, the fixed penalty must be increased or decreased within the limits established by law for the crime. In these cases, the prison term to be imposed will also be fixed. (Emphasis added.) Art. 58 of the 1974 Criminal Code (33 L.P.R.A. sec. 3282).

Pursuant to that article, at the time of the imposition of sentence, judges are limited to the application of the fixed penalty established for felonies in the absence of aggravating or mitigating circumstances. The finding of aggravating or mitigating circumstances is the key that allows judges to deviate from the fixed penalty established and grants them the discretion to impose any penalty they deem pertinent, within the limits established by the crime itself. Nevertheless, without this finding the judge cannot *74 impose a penalty greater or lesser than the fixed one already established.[4]

---

4. Art. 86 of the Criminal Code, *supra*, provides that "[w]hen the manslaughter is committed by someone while driving a motor vehicle, a fixed term of imprisonment of one (1) year shall be imposed. Should there be any aggravating circumstances, the fixed penalty established may be increased up to a maximum of three (3) years; should there be any mitigating circumstances, it may be reduced up to a minimum of six (6) months and one (1) day. The Court may impose restitution in addition to the established term of imprisonment, or both penalties."

When examining the legislative intent for article 58 of the 1974 Criminal Code, we find that it supports our interpretation of its text. Said article is the product of the Determinate Sentences Act, Law No. 100 of June 4, 1980 (34 L.P.R.A. sec. 1044). According to the Statement of Purpose of the aforementioned law, the old Indeterminate Sentences Act contributed to "a disparity in sentences and did not provide any certainty as to the penalties to be imposed for the crimes committed." Therefore, the Determinate Sentences Act was intended to give sentences "a greater degree of certainty so that they function as a deterrent factor for future criminal conduct by potential criminals and lead to uniformity in the way in which each crime is punished in accordance with its seriousness." Statement of Purpose for Law No. 100 of June 4, 1980 (1980 Laws of Puerto Rico 297).

Hence, one of the purposes in approving the Determinate Sentences Act, in addition to providing for certainty in the sentences imposed, was to limit the judges' discretion when applying the penalties already established. The old system of indeterminate sentences led to disparity, since different judges applied inconsistent penalties for similar facts, and therefore the administration of justice had intolerable variations from one judge to another. Therefore, the Determinate Sentences Act came to address such an anomaly, establishing fixed penalties for each one of the *75 felony, thereby limiting the discretion of the lower court judges.

■ Therefore, the text of Article 58 of the Criminal Code, *supra*, the wording for each one of the felonies established in said Code, and the legislative intent of the Determinate Sentences Act, support the conclusion that lower court judges, pursuant to the 1974 Criminal Code, lack discretion to impose any penalty within the range established for each crime.

When analyzing the penalty imposition system under the 1974 Criminal Code in accordance with the federal jurisprudence discussed above, we must conclude that our system, in its application, is not so different from the system established by California, which was declared unconstitutional in *Cunningham*. It is true that California's system, unlike ours, is based on a triad, meaning that only three sentences are possible: the intermediate, the minimum, and the maximum. However, what is decisive for the *Apprendi* analysis is not whether the system is one of triads or not, but to ascertain whether or not the judge has the discretion to impose any penalty within the range, or whether he or she has an obligation to impose the fixed penalty established for the crime, in the absence of mitigating or aggravating circumstances. In California, as in Puerto Rico, a judge has an obligation to impose the intermediate fixed penalty unless he or she makes a finding of mitigating or aggravating circumstances. *Apprendi* and subsequent cases apply to bar a judge from being the one who increases the penalty beyond the statutory limit when making his or her own finding as to the aggravating factors, but rather forces such finding to be made by a jury beyond a reasonable doubt.

Having accepted the limited discretion that our judges have to impose penalties under the 1974 Criminal Code, we must arrive at an appropriate solution for our system, taking into account the two avenues that the Supreme Court offered to the states in *Cunningham* to comply *76 with the *Apprendi* standard, and to be able to consider aggravating factors at the time an appropriate sentence is to be imposed in cases decided by a jury. According to the language in the 1974 Criminal Code and the

legislative intent of the Determinate Sentences Act, the creation of a penalty system in which the judge has absolute discretion to impose the penalty he or she feels is appropriate, independently of any findings of aggravating or mitigating factors, is the Legislative Assembly's task and not this Court's. Interpreting that Article 58 of the 1974 Criminal Code and the language for each one of the crimes that establish fixed penalties give judges total discretion to impose any penalty within the range would not only violate the clear letter of the law, but it would also detract from the legislative intent as put forth in the Statement of Purpose for the Determinate Sentences Act. Additionally, said interpretation would be a clear act of judiciary legislation in violation of the most fundamental precept of our Constitution and the separation of powers doctrine it promulgates.

 So the only solution we can adopt that is consistent with the determinate sentence system in the 1974 Criminal Code and with the right to jury trial guaranteed by the Sixth Amendment is to submit the aggravating factors to the jury and have them proved beyond a reasonable doubt. For all of the above, we find that in cases heard by a jury pursuant to the provisions of the 1974 Criminal Code, the aggravating factors for the penalty must be submitted to said institution and proven beyond reasonable doubt, except when admitted by the defendant.[5] The solution we adopt maintains the essence of our *77 penalty imposition system of granting limited discretion to lower court judges when imposing sentence, while equally respecting the defendants' right to a trial by jury.[6]

The current rules of Criminal Procedure do not contemplate the standard we are adopting today, but they do not hinder it, either. It is our function to establish the procedure that must be followed in cases heard by a jury. In cases in which the aggravating factors arise from the admissible evidence presented, the Prosecution may ask the Court that these be submitted to the jury jointly with the guilty or not guilty decision. Should the jury return a guilty verdict, it must likewise decide if the aggravating factors submitted were proven beyond a reasonable doubt.[7]

5. *"Rule 171. Sentencing; Evidence of mitigating or aggravating circumstances*

"The court, on its own motion or upon a motion by the defendant or the prosecutor, with notice to the opposing party or parties, may hear within the shortest period of time possible, evidence of mitigating or aggravating circumstances for purposes of imposing the penalty.
. . . . . . . .
"(b) The following may be considered as aggravating circumstances, among others:
"(1) Facts related to the commission of the crime and to the defendant, including among others:
"(A) The crime was one of violence, serious bodily harm was caused, or there was a threat to cause it, and facts were evidenced that reveal a great cruelty, no human respect, and a rejection of the standards of decency.
. . . . . . . .

"(G) The defendant threatened the witnesses, unlawfully prevented the witnesses from being present at the hearings, or induced them to commit perjury, or in any other way obstructed the judicial process.
. . . . . . . .
"(O) The victim of the crime is a person who is sixty (60) years of age or older. . . ." 34 L.P.R.A. Ap. II.

6. *"Determinate Sentence"*
"When the court imposes a prison term, it shall impose a determinate sentence that will have a specific duration. In felony cases, the fixed term established by law for that crime shall be imposed. Should there be any aggravating or mitigating circumstances, the fixed penalty must be increased or decreased within the limits established by law for the crime. In these cases the term of imprisonment imposed shall also be fixed." Art. 58 of the 1974 Criminal Code (33 L.P.R.A. sec. 3282).

On the other hand, if it is necessary to present evidence in addition to the one that is required in order to establish the commission of the crime that would otherwise not be admissible during trial, or when the judge finds that submitting the aggravating factors prior to the return of a verdict would cause an undue prejudice to the defendant, in which case the proceeding to be followed would be similar to the one currently established under the Rules of Criminal Procedure. According to Rules 162.4 and 171 of Criminal Procedure, both the defendant and the prosecutor may ask the Court to listen to the evidence as to the mitigating or aggravating circumstances for purposes of sentencing. See Rules 162.4 and 171 of Criminal Procedure, 34 L.P.R.A. Ap. II. The Prosecution may \*78 use the type of hearing provided for by said Rules to present evidence as to the aggravating factors deemed pertinent. The jury in those cases would not be dismissed immediately after rendering a verdict, but instead would have to make a finding as to the aggravating factors beyond a reasonable doubt based on the evidence presented at trial or based on the additional evidence that the Prosecution presents during said hearing. If the aggravating factors are not proven beyond a reasonable doubt for the jury, the judge will have an obligation to impose the fixed penalty, except when he or she deems that the mitigating circumstances have been proven, which would allow him or her to impose a lower sentence.[8] Finally, we must remember that since the standard we are establishing at this time is of a constitutional nature, applicable to criminal proceedings, it has a retroactive effect for all those cases that have not yet become firm and final as of today. *Pueblo v. González Cardona,* 153 D.P.R. 765, 772 (2001); *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). In those cases in which the defendant alleges that his or her sentence is unconstitutional pursuant to the standard adopted herein, and the court so finds, said defendant must be resentenced to the fixed term established for the crime in question. If it is in the Prosecution's best interest to have a penalty imposed with aggravating circumstances during the resentencing process, it shall be necessary for the lower court to holds \*79 a hearing for this purpose before a jury, and that these factors be proven beyond a reasonable doubt.[9]

### CERTIFICATION BY TRANSLATOR

I, JANIS PALMA, an English–Spanish interpreter and translator certified to that effect by the Administrative Office of the United States Courts and the National Association of Judiciary Interpreters and Translators (NAJIT) respectively, do hereby certify that I have translated the foregoing document and it is a true and accurate translation to the best of my knowledge and ability.

/s/

Janis Palma, USCCI, NCJIT–S Date

---

7. Likewise, the validity of the statutes under the federal standard has been sustained in several states, although their applicability has been limited pursuant to the Sixth Amendment and federal case law. See: *López v. People,* 113 P.3d 713 (Colo.2005); *Smylie v. State,* 823 N.E.2d 679 (Ind.2005); *State of Washington v. Hughes,* 154 Wash.2d 118, 110 P.3d 192 (2005); *State v. Dilts,* 337 Or. 645, 103 P.3d 95 (2004).

8. [Translator's note: there is no footnote 8 in the original document.]

9. [Translator's note: there is no footnote 8 in the original document.]